**Morgan v. Continental Casualty Company**

*David E. Lehman,* for plaintiff.
*Edward E. Knauss, III,* for defendant.

DOWLING, J., April 9, 1974.—Howard L. Morgan, plaintiff's 18-year-old son, was shot to death by Corporal David R. Seibert, of the Derry Township Police, fleeing the scene of an apparent attempted burglary. His father, beneficiary under defendant's insurance policy which provided benefits of $7,500, payable upon the boy's accidental death, has sued for the sum in question and the insurance carrier has asked for summary judgment, asserting that, as a matter of law, the death was not caused by accident.

Defendant has a heavy burden in its motion. Summary judgment is to be rendered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law": Pennsylvania Rule of Civil Procedure 1035(b). The burden of proof that there is no genuine issue of fact is on the moving party and all doubts are to be resolved against him: Schacter v. Albert, 212 Pa. Superior Ct. 58 (1968).

This tragedy took place on October 17, 1971, around 4:30 a.m., near the Hilltop Grocery Store, R.D. 1, Hummelstown. Corporal Seibert, an out-of-uniform and off-duty Derry Township policeman, responded to a silent alarm system installed on the grocery store

doors and running to the scene observed jimmy marks on one of the doors. Thinking that the suspects were in the building he backed away and continued to observe the area. In a short period of time, he saw two figures, which he described as "hippie type youths," *approaching* the door. One opened the door and started to enter. At this time, Seibert, who was approximately 20 feet away, called "hold it right there, police", but the individuals turned and fled. He immediately opened fire shooting directly at the Morgan boy who continued running. The body was found in the nearby woods, death having been caused by a bullet which struck him high in the back, exiting from his throat.

The store was closed and unoccupied at the time and later investigation showed that nothing had been taken. A neighbor who lived across the street testified that he was awakened by and heard the four shots fired by Seibert but, although his bedroom was on the front side of the house and the window open, he at no time heard any voices.

The officer testified that his purpose in firing the shots was to prevent the flight of these individuals and that he did not consider chasing them because they were running too fast.

The insurance contract under which the suit is brought is a group accident plan written by Continental Casualty Company for the Penn State University's faculty members and their dependent children. Plaintiff was an insured person under the policy, being a faculty member at the Milton S. Hershey Medical Center of the Penn State University. The policy calls for payment of benefits in the case of "accidental death." It also defines "injury" as meaning "bodily injury caused by an accident occurring while this policy is in force as to the insured person and

resulting directly and independently of all other causes in loss covered by this policy."

The policy does not further define "accident," nor does it incorporate the following exclusion which is permitted under the statute regulating policy provisions:

"The insurer shall not be liable for any loss to which a contributing cause was the insured's commission of or attempt to commit a felony, or to which a contributing cause was the insured's being engaged in an illegal occupation": Act of May 17, 1921, P. L. 682, as amended 40 PS §753(B)(10).

In the absence of a policy definition, the term "accident" must be defined by resort to common law and case law definitions. Our Supreme Court has in recent years utilized the following verbal formulations in defining the term "accident":

"Our Court in North American Life & Accident Insurance Co. v. Burroughs, 69 Pa. 43, 51, 52, defined the terms 'accident' and 'accidental': 'An accident is "an event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected; chance; casualty; contingency." And accidental signified, "Happening by chance or unexpectedly; taking place not according to the usual cause of things; casual, fortuitous. We speak of a thing as accidental when it falls to us as by chance and not in the regular course of things;" Webster's Dictionary ad verba' ": Dilks v. Flohr Chevrolet, 411 Pa. 425, 432 (1963).

"What is an accident? Everyone knows what an accident is until the word comes up in court. Then it becomes a mysterious phenomenon, and, in order to resolve the enigma, witnesses are summoned, experts testify, lawyers argue, treatises are consulted and even

when a conclave of twelve world-knowledgeable individuals agree as to whether a certain set of facts made out an accident, the question may not yet be settled and it must be reheard in an appellate court. An accident simply stated, is merely an unanticipated event; it is something which occurs not as the result of natural routine but as the culmination of forces working without design, coordination or plan. And the more disorganized the forces, the more confusedly they operate, the more indiscriminately haphazard the clash and intermingling, the more perfect is the resulting accident": Brenneman v. St. Paul Fire & Marine Ins. Co., 411 Pa. 409, 412-13 (1963).

The rule is fairly well established that although an insured is intentionally killed by another person, the death is deemed to have been caused by accident or through accidental means when it was neither foreseen, expected nor anticipated *by the insured.* A Superior Court case of some vintage, Horan, Jr. v. Prudential Insurance Company, 104 Pa. Superior Ct. 474 (1931), but recently cited, Beckham v. Travelers Insurance Company, 424 Pa. 107 (1967), is in point. There, the decedent and several companions were observed by a night watchman acting in a suspicious manner in the vicinity of a sporting goods store and upon being ordered to halt, fled with resulting gunfire and death. The case was tried by a judge sitting without a jury who found in favor of plaintiff suing on an insurance policy with the issue being whether the death was the result directly and independently of bodily injury effected solely through "external, violent and accidental means." In affirming the verdict, the appellate court, in language quite relevant to the instant matter, stated "[w]hether one intentionally exposes himself to a risk is usually a question of fact for the jury and not for the court, as a matter

of law." The court pointed out that under the facts they could not conclusively presume that the victim was engaged in the commission of a crime, noting that he was running away from a man attired as a civilian, firing a revolver.

And so, in this case, can we as a matter of law hold that decedent should have foreseen that if he fled in these circumstances he would be fired upon? Can this court state positively in view of the testimony of the neighbor that, while he heard the shots, he heard no voices, that the officer did identify himself to the youths. Although there is strong evidence that the victim was attempting to commit a burglary, could this court, even though an alarm had been sounded and the door jimmied, instruct the jury that it would be conclusively presumed that a person approaching this area and entering the door was attempting to commit a crime? Can we presume as a matter of law that this 18-year-old, assuming he had attempted to burglarize a store and had heard the officer himself, knew that, therefore, the policeman had a right to take his life to prevent him from escaping?

Actually, the decisional law is not that clear as to the officer's rights. A rather complete explanation of the powers of the police to use deadly force is set forth in Commonwealth v. Duerr, 158 Pa. Superior Ct. 484 (1946), where the court approved the following charge:

" 'The notion that a peace officer may in all cases shoot one who flees from him when about to be arrested is unfounded. Officers have no such power except in cases of felonies and there, as a last resort, after all other means have failed. It is never allowed, where the offense is only a misdemeanor and where there is only a suspicision of felony, the officer is not warranted in treating the fugitive as a felon. If he does this, he does so at his peril, and is liable if it

turns out that he is mistaken. An officer may lawfully arrest upon a suspicion of felony, but he is only warranted in using such force in making the arrest as is allowable in other cases not felonious, unless the offense was, in fact, a felony . . . The right of an officer to kill an escaping felon is limited to cases in which the officer knows that the person whom he seeks to arrest is a felon, and not an innocent person."

It has been held more recently in Commonwealth v. Chermansky, 430 Pa. 170, 173 (1968), that a private citizen does not have the right to use deadly force to prevent the escape of one who has committed burglary. At this hour of the night, with the officer out of uniform, is it not a question of fact whether the victim realized he was being confronted by the police? Was Howard Morgan's action, in fleeing when a shot had been fired at almost point blank range directly at him, justified? Did Corporal Seibert have the right to use deadly force under the circumstances? Was it a "last resort after all other means had failed"? These would all appear to be issues for the finder of facts and not for the court to rule on as a matter of law. In Commonwealth v. Micuso, 273 Pa. 474, 476 (1922), our Supreme Court stated " 'to excuse the taking of life in making an arrest it must appear that the killing was necessary to effect the object, and that the arrest could not have been made without it."

The authorities set forth by defendant in support of its motion are distinguishable. Defendant relies principally on Mohn v. American Casualty Company, 222 Pa. Superior Ct. 426 (1972), but there it was stipulated that the fleeing person had been engaged in a burglary and there appears to be no dispute as to the propriety of the attempted arrest procedure. Further, the Mohn opinion is distinguishable in that it relies

upon dictum in the case of Griffin v. Metropolitan Life Insurance Company, 48 Lack. 147 (1947). There, the case was submitted to a jury for its decision. In ruling on a motion for new trial, the court declared that "a nonsuit could have been entered." However, "Had there been a denial of warning, . . . it might have been a question for the jury." Id. at 148. Thus, where there is a factual issue as to whether the decedent was adequately warned, i.e., an issue as to the propriety of the arrest procedures, the issue should be submitted to the jury.

Other cases cited by defendant *affirm jury verdicts,* and do not rule on the issues of accidental cause as a matter of law, See Eagan v. Prudential Insurance Company, 128 S. W. 2d 1085 (Mo. Ct. App., 1939).

Under the peculiar facts of this case, there would appear to be material factual issues as to (1) whether decedent was engaged in a felony at the time immediately preceding his death; (2) even if he was engaged in a felony, whether the means employed to effect his arrest were proper, or were excessive and unreasonable; (3) whether decedent under the circumstances in which he found himself was not acting reasonably in attempting to evade and escape the individual shooting at him.

Officer Seibert testified both in his deposition and in the inquest that it was *not* his intention to kill the individual at whom he was shooting but merely to stop his flight. Surely, if the officer did not intend the death of this boy, a fortiori decedent did not intend his own death and the court cannot rule, as a matter of law, that decedent's action obtained this untimely result.

## ORDER

And now, April 7, 1974, defendant's motion for summary judgment is denied.