Flozell JONES, Administrator of the Estate of Dennis Jones, Appellant,

v.

Keith MARSHALL, Appellee.

No. 55, Docket 74–2545.

United States Court of Appeals,
Second Circuit.

Argued Sept. 3, 1975.

Decided Nov. 24, 1975.

Louis I. Parley, West Hartford, Conn. (Bruce C. Mayor, Hartford, Conn., on the brief), for appellant.

Robert Y. Pelgrift, Hartford, Conn., for appellee.

Before SMITH, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal presents the question whether a civil rights action lies, under 42 U.S.C. § 1983, against a police officer who, in the course of his duty, shoots and kills a person who has committed a felony and is trying to escape arrest. The crime involved here—auto theft—did not involve conduct threatening use of deadly force; nor was there, at the time of the shooting, substantial risk that the person fleeing arrest would cause death or serious bodily harm to anyone if his apprehension were delayed. The United States District Court for the District of Connecticut, M. Joseph Blu-

menfeld, *Judge,* granted the defendant police officer's motion for summary judgment, holding that the Connecticut common law rule as stated in *Martyn v. Donlin,* 151 Conn. 402, 198 A.2d 700 (1964), affords a privilege, in the circumstances of this case, to an officer using deadly force who reasonably believes such force is necessary to effect an arrest for a felony. Judge Blumenfeld ruled that since the Connecticut privilege is not unconstitutional, it affords a defense to the § 1983 action for deprivation of the fleeing persons's life without due process of law. 383 F.Supp. 358 (D.Conn.1974).[1] We affirm.

The parties have stipulated the following facts. On August 29, 1969, Officer Marshall of the West Hartford Police Department was cruising in his patrol car in the ordinary course of his duties. While on patrol he observed a Cadillac automobile occupied by three Negro males, including the appellant's decedent, Dennis Jones, traveling in the vicinity of the Hartford Golf Club. Through radio contact with headquarters, Marshall received the information that the Cadillac had been reported as stolen, so he began to follow it as it drove through the Golf Club and adjacent streets. Both cars proceeded for several blocks, neither exceeding 35 to 40 miles per hour nor violating any traffic regulations. While following the car Officer Marshall did not activate his siren or warning light or make any attempt to cause the car to come to a stop. He was then informed over his radio that assistance from the Hartford Police Department was on the way.

Evidently the individuals in the Cadillac became aware that they were being followed because after circling back onto Mark Twain Drive from Dillon Road, they accelerated to about 80 miles per hour and drove north on Mark Twain Drive. After traveling several blocks at that speed the car reached the end of the Mark Twain Extension and skidded to a halt. Officer Marshall, who had followed, also came to a sliding stop, and the braking of both cars created a large cloud of dust. The officer alit from his cruiser with his weapon drawn. Since the occupants of the car were not immediately visible he climbed to the top of a nearby embankment. At that point he observed two men running across an open field and called to them to halt. They momentarily turned to face him, but then turned and began to run away toward a nearby wooded area. Without firing a warning shot or attempting any further means of apprehension, Officer Marshall fired his gun at Dennis Jones, who was then about 125 feet away across rough terrain which contained a gully and was covered with bushes and underbrush. The shot was aimed at the decedent's leg, but struck him in the left buttock, causing internal injuries which resulted in his death. It is stipulated that neither Dennis Jones nor the other two occupants of the car, all of whom were minors approximately 16 years old, were armed or had specifically threatened[2] physical injury in any manner to Officer Marshall or anyone else. It is also stipulated that the automobile pursuit did not endanger any other individual than the occupants, although had the chase continued obviously it might have.[3]

---

1. The action originally named the Town of West Hartford and its police chief and town manager, but the action was dismissed as to them. *Cf. City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

2. It may be noted that both of the young men in the car with Dennis Jones were arrested by the Hartford police on the day following the auto theft and shooting. Neither was charged with a felony; the charge against one was

ultimately dropped and the other pleaded guilty to a misdemeanor charge and received a suspended sentence.

3. It does not appear from the stipulation whether Jones was the driver or a passenger of the Cadillac. Nor does it appear what his age was, although appellants brief states that he was 16 years old. It also does not appear what caliber revolver Officer Marshall was using or the extent of his training in marksmanship.

It was agreed by the parties that the law in Connecticut at the time of the shooting in this case was that theft of a motor vehicle was a felony offense, Conn.Gen.Stat. § 53a–119,[4] but that joyriding was only a misdemeanor, Conn. Gen.Stat. § 14–229 (use without owner's permission).[5] The common law rule in Connecticut is that an arresting officer may use such force as he reasonably believes to be necessary under all of the circumstances to effect a legal arrest and to prevent an escape. The use of force likely to cause death, however, is privileged only if the officer reasonably believes that a felony has been committed by the individual sought to be apprehended and the force used was actually and reasonably believed by him in good faith to be necessary to effect the arrest. See Martyn v. Donlin, supra, 151 Conn. at 411–12, 198 A.2d at 705–06.[6] During a codification and revision of Connecticut's criminal laws occurring after the facts in this case, the Martyn rule was retained and codified as a part of the Connecticut criminal law.[7]

The appellant's argument involves two simple steps. First, that in actions

---

4. Larceny of any automobile is now a "Class D" felony. Conn.Gen.Stat. § 53a–123. Under a complicated formula set forth in Conn.Gen. Stat. § 53a–35(b)(4), Class D felonies carry a maximum sentence of five years. While the parties stipulated that the offense was a felony at the time of the shooting, the stipulation erroneously refers to Conn.Gen.Stat. § 53a–47, a provision dealing with acquittal on grounds of mental disease or defect. The crime was, however, a felony under Conn.Gen.Stat. § 53a–57. See State v. Keeby, 159 Conn. 201, 268 A.2d 652 (1970), cert. denied, 400 U.S. 1010, 91 S.Ct. 569, 27 L.Ed.2d 623 (1971). The automobile theft provision in the Connecticut code now appears as Conn.Gen.Stat. § 53a–119.

5. Conn.Gen.Stat. § 53a–25(a) defines a felony as an offense "for which a person may be sentenced to a term of imprisonment in excess of one year . . . ." The statute also provides that any offense defined in any other section of the Connecticut General Statutes which "by virtue of any expressly specified sentence, is within the definition set forth in subsection (a) shall be deemed an unclassified felony." Id. § 53a–25(c). Since "joyriding" is punishable by a prison sentence of up to one year for a first offense, up to 10 years for a second offense and up to 15 years for a third offense, id. § 14–229, it is somewhat of a hybrid for the purpose of making this classification. However, as to first offenses, unauthorized use of a motor vehicle would appear to constitute only a misdemeanor. See id. § 53a–26(c).

6. At least as of 1974, the Connecticut State Police Rules §§ 20–29 limit the use of deadly force to two situations: (1) where the felony is one involving risk of serious bodily harm and (2) where there is a risk that the felon's efforts to escape will cause harm to the officer or others. Apparently the West Hartford Police Department had issued a Training Bulletin (Oct. 27, 1967), directing officers not to shoot at a motor vehicle (or presumably its occu-

pants) except in those limited circumstances. It does not appear from the stipulation of facts, however, whether Officer Marshall was aware of this Bulletin or of the extent of its effect.

7. Conn.Gen.Stat. § 53a–22 provides in part:

(a) For purposes of this section, a reasonable belief that a person has committed an offense means a reasonable belief in facts or circumstances which if true would in law constitute an offense. If the believed facts or circumstances would not in law constitute an offense, an erroneous though not unreasonable belief that the law is otherwise does not render justifiable the use of physical force to make an arrest or to prevent an escape from custody. A peace officer or an authorized official of the department of correction who is effecting an arrest pursuant to a warrant or preventing an escape from custody is justified in using the physical force prescribed in subsections (b) and (c) unless such warrant is invalid and is known by such officer to be invalid.

(b) Except as provided in subsection (a), a peace officer or authorized official of the department of correction is justified in using reasonable physical force upon another person when and to the extent that he reasonably believes it necessary to:

(1) Effect an arrest or to prevent the escape from custody of a person whom he reasonably believes to have committed an offense, unless he knows that the arrest or custody is unauthorized; or

(2) defend himself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape.

(c) A peace officer or authorized official of the department of correction is justified in using deadly physical force upon another person for the purposes specified in subsec-

brought under the federal civil rights statutes the law to be applied is federal law—while reference may be made to state or other law consistent with the United States Constitution, it is not mandatory, as a matter of choice of law, that state law be applied. Second, federal decisions and modern policy indicate that the federal rule to be applied in actions under the federal civil rights statutes, e. g., 42 U.S.C. §§ 1983, 1985(3), is that use of deadly force is not permissible in the case of any escape where a felony has been committed except in a few limited situations essentially embodied in ALI Model Penal Code § 3.07 (Proposed Official Draft 1962).[8] Appellant

argues that the use of force is justifiable "only where the arresting officer believes that (1) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force, or (2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed." *Id.*

■ Appellant further argues that the common law rule in Connecticut lacks logical support, is based upon historically outmoded concepts of outlawry and trial by ordeal and has been uniformly disapproved by scholars.[9] In contrast, appellant argues, the Model Penal Code rule,

---

tion (b) only when he reasonably believes that such is necessary to:

(1) Defend himself or a third person from the use or imminent use of deadly physical force; or

(2) effect an arrest or to prevent the escape from custody of a person whom he reasonably believes has committed or attempted to commit a felony.

8. The ALI Model Penal Code § 3.07 (Proposed Official Draft 1962) makes the following proposal for the use of force in law enforcement:

(1) *Use of force justifiable to effect an arrest.* Subject to the provisions of this Section and of Section 3.09, the use of force upon or toward the person of another is justifiable when the actor is making or assisting in making an arrest and the actor believes that such force is immediately necessary to effect a lawful arrest.

(2) *Limitations on use of force.*

(a) The use of force is not justifiable under this Section unless:

(i) the actor makes known the purpose of the arrest or believes that it is otherwise known by or cannot reasonably be made known to the person to be arrested; and

(ii) when the arrest is made under a warrant, the warrant is valid, or believed by the actor to be valid.

(b) The use of deadly force is not justifiable under this Section unless:

(i) the arrest is for a felony; and

(ii) the person effecting the arrest is authorized to act as a peace officer or is assisting a person whom he believes to be authorized to act as a police officer; and

(iii) the actor believes that the force employed creates no substantial risk of injury to innocent persons; and

(iv) the officer believes that:

(1) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or

(2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed.

9. The claim is also made that the Connecticut rule violates the due process clause of the Fourteenth Amendment because, procedurally speaking, it permits the arbitrary imposition of death by the officer, violates the presumption of innocence, and denies the suspect a right to trial by jury. Of course each of the due process arguments would apply equally where deadly force is allowed to effect an arrest for a crime which does involve "conduct including the use or threatened use of deadly force" or where "there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed." ALI, note 8 *supra,* § 3.07(b)(iv). The killing by the police officer in such a case would, as much as the killing here, deprive the escapee of his life without any procedural guarantees. It would also raise the Eighth Amendment implications regarding arbitrary imposition of the death penalty sanction set forth in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), due to the individual arresting officer's discretion in his exercise of the power to kill. Thus, by arguing that the Model Penal Code rule is federal law under 42 U.S.C. § 1983, and is therefore constitutional, the appellant has conceded away, as Judge Blumenfeld held, his procedural due process and *Furman* arguments; death under Model Penal Code situations could surely be argued to be equally arbitrary and without procedural safeguards. We need not, and therefore do not, consider the argument further.

which has been adopted in form or substance in a number of states by statute,[10] is consistent with the laws and Constitution of the United States and the needs of law enforcement personnel. He therefore concludes that the rule of the Model Penal Code should be adopted in this case under 42 U.S.C. § 1983.

The appellee's position is less complex. He assumes that since the challenged law of Connecticut, as expressed in *Martyn v. Donlin, supra,* and in the new Connecticut Penal Code, is constitutional, in that it does not "shock the conscience," *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *United States v. Toscanino,* 500 F.2d 267, 273 (2d Cir. 1974), or otherwise offend any constitutional principle, it is therefore the applicable rule in the case. This was the position taken by Judge Blumenfeld in his decision below. 383 F.Supp. at 362.

■■■ With this view, however, we cannot agree. It has long been understood that in interpreting the scope of § 1983 we are not bound by the state law of torts or the defenses of privilege that law provides. In an unbroken line of Supreme Court cases which includes *Ex parte Virginia,* 100 U.S. 339, 346, 25 L.Ed. 676 (1879); *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *Screws v. United States,* 325 U.S. 91, 109–11, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *Williams v. United States,* 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951); *Monroe v. Pape,* 365 U.S. 167, 183–87, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and *Scheuer v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the conduct of police officers and other state

officials has, both civilly (*Monroe, Pierson, Scheuer*) and criminally (*Classic, Screws, Williams*), been held subject to standards demanded by the Constitution of the United States, regardless of approbation by state law.[11] This is necessarily so because one of the principal purposes underlying the Civil Rights Acts of 1871 and 1875 was to protect individuals against "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law . . . ." *United States v. Classic, supra,* 313 U.S. at 326, 61 S.Ct. at 1043. *See* 1 B. Schwartz, Statutory History of the United States: Civil Rights 591–653 (1970 ed.). *See generally Monroe v. Pape, supra,* 365 U.S. at 173, 81 S.Ct. 473. The phrase in Section 1 of the Act of April 20, 1871, 17 Stat. 13 (known as Civil Rights Act of 1871 and also as "the Ku Klux Act"), *as amended,* 42 U.S.C. § 1983, which provides for liability, "any . . . law, statute, ordinance, regulation, custom or usage of the State to the contrary notwithstanding," makes this patently clear. A state rule of immunity or privilege which allows a state officer to escape liability for a deprivation of "rights, privileges, or immunities secured by the Constitution of the United States" is simply not controlling under 42 U.S.C. § 1983.

■■■ At the same time not every tort committed against a private person by an official acting under state law rises to the deprivation of a constitutional right; that is to say, there is no "general federal tort law . . . ." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (interpreting § 1985(3), derived from § 2 of the Act of April 20, 1871, 17 Stat. 13). For exam-

---

**10.** *E.g.,* Ill.Ann.Stat., ch. 38, § 7–5 (Smith-Hurd 1962); N.H.Rev.Stat.Ann. § 627:5 (1971); 18 C.P.S.A. § 508 (1972).

**11.** The Rules of Decision Act, 28 U.S.C. § 1652, does not require a different result. It provides that "[t]he laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts

of the United States, in cases where they apply." However, the Rules of Decision Act does not mandate application of state law in actions brought under 42 U.S.C. § 1983 where the law to be applied is federal law, even if state law is incorporated by reference as a part of that law. Construction and elaboration of the reach of § 1983 is an issue of federal law.

ple, state legislators' immunity, *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and judges' immunity, *Pierson v. Ray, supra,* 386 U.S. at 553–55, 87 S.Ct. 1213, each established at common law, have survived the enactment of § 1983. The latter, in fact, has been adopted as federal common law. *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1872). But *Pierson v. Ray, supra,* 386 U.S. at 555, 87 S.Ct. 1213, points out that police officers never had an absolute and unqualified immunity at common law. In that case the Supreme Court did recognize a limited privilege under § 1983 in a false arrest situation where the arrest was made in good faith under a statute later held unconstitutional. The Court expressly upheld "the defense of good faith and probable cause . . . available to the officers in the common-law action for false arrest and imprisonment . . . ." 386 U.S. at 557, 87 S.Ct. at 1219. In so doing, the Court looked to "the prevailing view in this country," citing general sources, such as the Restatement (Second) of Torts § 121 (1965), and 1 Harper & James, The Law of Torts § 3.18 (1956). 386 U.S. at 555, 87 S.Ct. at 1218. It is true that the court in *Pierson* referred to the expansive language of *Monroe v. Pape, supra,* 365 U.S. at 187, 81 S.Ct. 473, which states that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Pierson v. Ray, supra,* 386 U.S. at 556, 87 S.Ct. at 1219. The opinion modified that phrase, however, to recognize some affirmative defenses under § 1983, saying "Part of the background of tort liability, in the case of police officers making an arrest, is the defense of good faith and probable cause." 386 U.S. at 556–57, 87 S.Ct. at 1219.

■ So, too, in discussing the qualified immunity of the executive branch of a state government, the Supreme Court has referred to a variety of general sources—English common law and statutes, federal and state cases—to support an immunity which varies with "the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based." *Scheuer v. Rhodes, supra,* 416 U.S. at 247, 94 S.Ct. at 1692; see also id. at 239 n. 4, 240–49.

■ While we are, then, not bound by whatever privilege state law may afford to the officer we still are by no means free to elevate whatever view of the privilege we think to be preferable to the constitutional level envisaged by § 1983. Rather, with only the example of *Pierson* and *Scheuer* before us we must make a studied attempt to weigh the competing interests in the light of historical and current cases and commentary to arrive at a scope of the privilege to use deadly force in particular instances.

Initially we should point out that we agree with appellant that the problem of determining the appropriate rule of privilege for the use of force by arresting officers is complicated by the fact that the common law rule evolved when only a few crimes were felonies, and all of them involved force or violence (arson, burglary, robbery, rape, murder, manslaughter) and were punishable by death and forfeiture of lands and goods. *See* ALI, Model Penal Code § 3.07, Comment 3 at 56 (Tent. Draft No. 8, 1958). ("Such rational justification for the common law rule as can be adduced rests largely on the fact that virtually all felonies in the common law period were punishable by death.") *But see* Note, *Justification for the Use of Force in the Criminal Law,* 13 Stan.L.Rev. 566, 572–82 (1961). Many American jurisdictions, Connecticut included, have of course expanded the number of felonies to include numerous crimes not involving force or violence, crimes which relate to property and to compliance with complex governmental regulations (*e. g.,* income tax fraud). As the scope of "felony" crimes has expanded wholly away from the concept of violence which underlay its common law origin, the use of the felony label to justi-

fy especially severe police behavior has become increasingly strained. As stated by Judge McCree in his concurring opinion in *Beech v. Melancon*, 465 F.2d 425, 426–27 (6th Cir. 1972), *cert. denied*, 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973):[12]

. . . I would find it difficult to uphold as constitutional a statute that allowed police officers to shoot, after an unheeded warning to halt, a fleeing income tax evader, antitrust law violator, selective service delinquent, or other person whose arrest might be sought for the commission of any one of a variety of other felonies of a type not normally involving danger of death or serious bodily harm.

■ The elementary requirements of a use of force rule under § 1983 must be that it neither permits "brutal police conduct," *Rosenberg v. Martin*, 478 F.2d 520, 526 (2d Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973), nor allows such "application of undue force" that the police conduct "shocks the conscience." *Johnson v. Glick*, 481 F.2d 1028, 1032, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973) (holding that a § 1983 action lies by a prison inmate for an unprovoked attack by a guard). As Judge Friendly pointed out in *Johnson*, while the oft-quoted language from *Rochin* gains added content from other language in the opinion,[13] it is not exactly precise. We must analyze such factors as "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort . . . or maliciously or sadistically . . . ." *Johnson v. Glick, supra*, 481 F.2d at 1033. Judge Friendly's comments were, to be sure, made in the course of determining whether a claim was stated rather than whether a privilege existed. However, a privilege, simply stated, is a rule of law exempting one from liability for conduct which would otherwise subject him to it. Restatement (Second) of Torts § 10 (1965). This is no different from saying that privileged conduct is not tortious. *See id.* Comment a. Thus, whether we approach the case from the standpoint of Judge Friendly in *Johnson*, where the issue was whether the conduct was tortious, or from the standpoint of privilege, where the issue is whether the conduct is not tortious, the analytical factors must be the same.

■ We find in this case that a number of legislatures, but few if any courts on their own initiative, have analyzed the factors just discussed and have moderated the harshness of the old common law view. There is, in short, a discernible trend in this century away from allowing the use of deadly force by a police officer in effecting a felon's arrest. But this trend is not so momentous or compelling as to require us to recognize a § 1983 action to lie in the situation of this case. This is to say that we do not

---

12. *See also* Chief Justice Burger's comment in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 419, 91 S.Ct. 1999, 2016, 29 L.Ed.2d 619 (1971) (dissenting opinion):

Freeing either a tiger or a mouse in a schoolroom is an illegal act, but no rational person would suggest that these two acts should be punished in the same way. From time to time judges have occasion to pass on regulations governing police procedures. I wonder what would be the judicial response to a police order authorizing "shoot to kill" with respect to every fugitive. It is easy to predict our collective wrath and outrage. We, in common with all rational minds, would say that the police response must relate to the gravity and need; that a "shoot" order might conceivably be tolerable to prevent the escape of a convicted killer but surely not for a car thief, a pickpocket or a shoplifter.

13. The acts must do more than "offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically"; they must be such as "to offend even hardened sensibilities" [*Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952)], or constitute force that is "brutal" and "offensive to human dignity." 342 U.S. at 174, 72 S.Ct. 205.

*Johnson v. Glick*, 481 F.2d 1028, 1033 n. 6 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973).

believe that our responsibility to give effect to the important civil rights protected by § 1983 provides us with a sufficient mandate to provide a remedy in this case by rejecting the rule of privilege developed by the state to further its own important objective of enforcing its penal law. The preferable rule would limit the privilege to the situation where the crime involved [14] causes or threatens death or serious bodily harm, or where there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed. But we are not satisfied, given the history and current status of the law of privilege, the ready availability of handguns to the populace at large (including nonviolent felons), and the needs of law enforcement in a society where violence is widespread, that we can or should impose that view through § 1983 as a federal standard to which all states would be subject. We are aware, moreover, that to do so in this case, where the Connecticut Supreme Court has fairly recently (1964) taken the contrary view, a view which has even more recently (1971) expressly been preserved in a legislative recodification of the state criminal law, would be to deny the officer the defense of good faith reliance upon the law of his state.[15]

The question of use of deadly force in preventing escape [16] arises here in the narrow context where there is no belief in its necessity for the protection of the officer or of any innocent third persons. In this context, we find the history of the treatment afforded the officer's privilege by the American Law Institute to be enlightening.[17] The first Restatement of Torts § 131 (1934) extended that privilege only to arrests for treason or a felony which normally causes or threatens death or serious bodily harm, or which involves the breaking and entry of a dwelling place. Official Comment h to § 131 of the Restatement stated that deadly force was not privileged for every common law felony,[18] that crimes are indiscriminately labeled as felonies or misdemeanors, and that it would "be monstrous to make the privilege . . . depend upon the word used by the legislature in describing the offense or upon the penalty attached to its commission." This conclusion was felt to be particularly forceful in light of the fact that the force used imperils the suspect as well as the guilty. *Id.* at 305. This rule of the first Restatement of Torts, which approximates the one advocated by appellant, was, however, overturned by the ALI in 1948. Restatement of the Law, 1948 Supplement, Torts § 131, at 628 *et seq.* (1949). The revised rule would permit the privilege where the arrest is for treason or any felony which has been committed, if the actor reasonably believes the offense was committed by the

14. We would not incorporate the felony/misdemeanor distinction into this rule, for a felony is usually based merely on the length of sentence involved, and some misdemeanors involve conduct more dangerous than many felonies. *See* ALI, Model Penal Code § 3.07, Comment 3, at 56 (Tent. Draft No. 8, 1958).

15. A defense which, however, might be less available to him as a result of the West Hartford Police Department Training Bulletin, note 4 *supra.* This possibility has not, however, been explored by appellant, and our record comes to us with a stipulation that Officer Marshall *had* acted in good faith. *See* note 24 *infra.*

16. A question which is distinct from the use of deadly force in effectuating arrest, where force may clearly be used to counter force. ALI, Model Penal Code § 3.07, Comment 3, at 56 & n. 3 (Tent. Draft No. 8, 1958).

17. While ALI sanction of a rule even when coupled with American Bar Association and other distinguished endorsement may be helpful, *see Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), it is no guarantee of constitutionality. *See Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *id.* at 722 & nn. 6–8 (Stewart, *J.,* dissenting).

18. Blackstone's view was to the contrary. He believed a homicide to be justifiable "[w]here an officer, or a private person, attempts to take a man charged with a felony and is resisted, and in the endeavor kills him." Blackstone's Commentaries, bk. 4, ch. XIV, at 827 (Gavit ed. 1941). The only qualification placed on the common law rule by Blackstone was that "there must exist an apparent necessity on the officer's side . . . that the party could not be arrested" without the use of deadly force. *Id.*

other and that the arrest cannot otherwise be effected.[19] The notes of the reporter for the 1948 revision, Professor Eldredge, criticize the reliance by the earlier reporter, Professor Bohlen, on one of three dicta from early American case law. Professor Eldredge flatly states that Comment h of § 131 of the first Restatement (and its accompanying illustrations) has "no authority" to support it. He cites five cases decided since 1926 contrary to § 131,[20] and concludes that "[n]o case has been found which has cited § 131 or which is in accord with it." Restatement of the Law, 1948 Supplement, *supra,* at 633.[21] While the reporter to the 1948 revision allows that § 131 of the first Restatement is a "desirable rule of law," Restatement of the Law, 1948 Supplement, *supra,* at 634, the revision is necessary in a "Restatement of existing authorities" since "[e]very case which . . . decides the question agrees that the original English common law is still the law." *Id., but see* note 21 *supra.* It is in this context that the Model Penal Code was adopted by the American Law Institute in 1962. In this Code there are comments which refer to the common law distinction between felony and misdemeanor crimes for the purpose of determining the scope of the

privilege to use deadly force as "manifestly inadequate for modern law." ALI, Model Penal Code § 3.07, at 56 (Tent. Draft No. 8, 1958). The authors of the Model Penal Code point out the anomaly resulting from juxtaposition of the general rule that deadly force can be used to *prevent* the commission of a felony only if the felony involves substantial risk to life and limb, *e. g., Commonwealth v. Beverly,* 237 Ky. 35, 39, 34 S.W.2d 941, 943 (1931), with the rule that such force can be used to obtain an arrest for *any* felony.[22] In contrast, the Restatement (Second) of Torts § 131 (1965) has simply carried forward the 1948 revision of the original Restatement of the Law of Torts and quotes the comment in the 1948 Supplement without reference to the Model Penal Code.

The American Law Institute's almost 50 years of consideration of the problem demonstrates that the area in which we are treading is one still characterized by shifting sands and obscured pathways. The leading text, 1 Harper & James, *supra* § 3.18 (1956), cannot suffice on its own to lead us out of the wilderness. The authors seem to equate the rule for effectuating an arrest with that of re-

19. If the arrest were made under a warrant for a felony the use of deadly force was privileged so long as the person named in the warrant was being arrested and the officer reasonably believed the arrest could not otherwise be effected. Restatement of the Law, 1948 Supplement, Torts § 131 (1949).

20. The most frequently cited of which is *Stinnett v. Commonwealth of Virginia,* 55 F.2d 644 (4th Cir. 1932) (Parker, *J.*).

21. *But see Commonwealth v. Duerr,* 158 Pa. Super. 484, 492–93, 45 A.2d 235, 239 (1946), citing and relying on Restatement of Torts § 131, apparently, however, in support of the proposition that the felony must actually have been committed. Three of the five cases relied upon in the reporter's notes to the 1948 revision, *see* Restatement of the Law, 1948 Supplement, Torts § 131, at 632–33 (1949), upheld the claim of privilege on the officer's part in a criminal case brought against him, rather than in a civil suit for damages. Seemingly in a criminal case the officer's reliance on a common law privilege goes to his willfulness or *mens rea*, a matter not so much in issue in a

civil liability context. Neither the commentators nor the cases seem to make any distinction as to the use of the privilege although we can readily perceive extending greater protection to the officer charged with a crime than one sued for damages.

22. The Model Penal Code reporter also points to the more refined analysis suggested by Professor Henry Hart which would require postponement of the arrest, rather than use of deadly force, in all but a few named instances. ALI, Model Penal Code § 3.07, at 60 (Tent. Draft No. 8, 1958). See also the contrary remarks of Professor Waite of the Advisory Committee, who would require of the person being arrested not only "abstention from active resistance" but "the even easier abstention from flight." *Id.* at 61. The reporter and a "large majority of the Advisory Committee and the Council" deemed "the balance of advantage on the side of limiting the use of deadly force for the sole purpose of effecting an arrest." *Id.* at 63. They conceded, however, that "[n]o perfect principle of limitation can be formulated." *Id.*

taining custody once properly acquired, *id.* at 284; *see also* Restatement (Second) of Torts § 134 (1965), and state that

> [i]n the absence of a specific statute . . . the more desirable rule is that only such felonies as threaten death or serious bodily harm will justify the use of deadly force to effect an arrest therefor, and such force may be used only when it reasonably appears that the arrest can be made in no other way.

1 Harper & James, *supra,* at 284.

 While we need not, either to extend or to limit liability, "tie section 1983 to the technicalities of state law," *Street v. Surdyka,* 492 F.2d 368, 370 (4th Cir. 1974) (extending privilege of officer), we recognize that actions under § 1983 are to some extent "analogous to tort actions," *Dowsey v. Wilkins,* 467 F.2d 1022, 1025 (5th Cir. 1972). Here we are dealing with competing interests of society of the very highest rank—interests in protecting human life against unwarranted invasion, and in promoting peaceable surrender to the exertion of law enforcement authority. The balance that has been struck to date is very likely not the best one that can be. In an area where any balance is imperfect, however, there must be some room under § 1983 for different views to prevail. The Connecticut rule carries with it the defects explicated above; it makes no distinction between felonies and therefore could be argued to involve an element of irrationality. It also creates an anomalous asymmetry to the privilege relating to the use of force for preventing the commission of felonies. Furthermore, it is contrary to the recommendations of the new proposed federal criminal code, *see* U. S. National Commission on Reform of Federal Criminal Laws, Study Draft of a New Federal Criminal Code § 607(2)(d) (1970),[23] and the statute law of one of the other two states in this

circuit, New York, N.Y. Penal Law § 35.30(1)(a) (McKinney 1975), although apparently not of the other, 13 Vt.Stat. Ann. § 2305 (1974). This would seem peculiarly to be one of those areas where some room must be left to the individual states to place a higher value on the interest in this case of peace, order, and vigorous law enforcement, than on the rights of individuals reasonably suspected to have engaged in the commission of a serious crime. We do not believe that this approach to interpreting § 1983 hearkens back to the early Supreme Court interpretation of the due process clause which condoned all state procedural rules which were in conformity with "settled usage," *e. g., Twining v. New Jersey,* 211 U.S. 78, 101, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *Hurtado v. California,* 110 U.S. 516, 528, 4 S.Ct. 111, 28 L.Ed. 232 (1884). This approach has been overruled in *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and we by no means would employ it here. While the Fourteenth Amendment may require us to make an independent assessment of the fairness of the state rule, however, we are today interpreting § 1983, and within that statute the states must be given some leeway in the administration of their systems of justice, at least insofar as determining the scope of such an unsettled rule as an arresting officer's privilege for the use of deadly force. Further, in the light of the shifting history of the privilege, we cannot conclude that the Connecticut rule is fundamentally unfair.

 All of which would not say that, under the original stipulation of facts, the complaint should have been dismissed, as it was on cross motions for summary judgment. As the facts were originally stipulated there were still four questions of fact to be determined under the Connecticut's common law rule: (1) whether Marshall actually believed and

---

**23.** This provision was adopted for the proposed federal criminal code following the recommendations of the U. S. National Commission on Reform of Federal Criminal Laws, 1 Working Papers 268–69 (1970), and The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police 189 (1967).

(2) whether Marshall reasonably believed that Jones was a felony suspect; and, even more importantly, (3) whether Marshall actually believed and (4) also reasonably believed that it was necessary under the circumstances to use deadly force to make the arrest. The absence of any one of these four elements would have rendered the Connecticut privilege unavailable, *Martyn v. Donlin, supra.* Without our having finally to determine the issue here, any such absence might also have given rise to an action for damages under § 1983.[24] But the original stipulation was amended not once but twice to take these issues out of the case.[25] Thus no factual issues remain. We accordingly affirm the judgment below. So holding we do not need to pass on the troublesome question whether felonious theft of an automobile resulting in a high-speed chase in a rural area creates or under a given set of circumstances could create a "substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed." *See* ALI, Model Penal Code § 3.07(2)(iv)(2) (proposed official draft 1962). Even were we to hold that § 1983 incorporated the Model Penal Code rule it is far from certain

whether the appellant would prevail at a trial on the merits.

Judgment affirmed.

---

**24.** These qualifications serve to take quite a little of the sting out of the harsh common-law rule. As Comment f to Restatement of the Law, 1948 Supplement, Torts § 131, at 630 (1949), relied on by the Connecticut Supreme Court in *Martyn v. Donlin,* 151 Conn. 402, 412, 198 A.2d 700, 706 (1964), says:

> The interest of society in the life of its members, even though they be felons or reasonably suspected of felony, is so great that the use of force involving serious danger thereto, is privileged only as a last resort when it reasonably appears to the actor that there is no other alternative except abandoning his attempts to make the arrest.

**25.** In order to remove these factual issues from the case, appellant's counsel joined in the two following amendments to the stipulated facts:

> *Amendment to Stipulations,* August 15, 1974
> 1. Marshall actually believed that it was necessary under the circumstances to use deadly force to make the arrest.
> *Further Amendments to Stipulations,* August 26, 1974

> 1. It was reasonable for Marshall to believe, that in order to make the arrest, it was necessary to use deadly force.
> 2. Marshall believed that the Defendant [sic] was a felony suspect.
> 3. It was reasonable for Marshall to believe that the Defendant [sic] was a felony suspect.

We have no trouble in concluding that references in these stipulations to "the Defendant" were intended to refer to "the Decedent."

If the reason for the plaintiff's entering this stipulation was to present the Connecticut law in its worst possible factual light, the ploy has backfired since plaintiff has stipulated out of the case the very elements which would tend on the facts first stipulated to give rise to a federal claim under the facts here involved.

