Mary KEYES and James Norris,
Plaintiffs,

v.

The CITY OF ALBANY, Thomas Burke, as Police Chief, John Tanchak, Thomas Nolan, and Valerie Von Dollen, as Members of the Albany Police Department, and John Doe and Other Unknown Members of the Albany Police Department, Defendants.

No. 82–CV–1130.

United States District Court,
N.D. New York.

Sept. 12, 1984.

Martin Brickman, Albany, N.Y., for plaintiffs.

Vincent J. McArdle, Jr., Corp. Counsel, Albany, N.Y., for defendants; John L. Shea, Asst. Corp. Counsel, Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

Inartfully pleaded in the seven "causes of action" set forth in the instant complaint are plaintiffs' claims for due process, equal protection and fourth amendment deprivations arising from the entry of City of Albany police officers upon the premises of plaintiff James Norris and the assault, arrest and detention of plaintiff Mary Keyes. Defendants John Tanchak, Thomas Nolan and Valerie Von Dollen are the officers charged with direct participation in these alleged civil rights violations. Defendants City of Albany and Thomas Burke, Police Chief of the City of Albany, are accused of failure to adequately train and supervise the officers whose conduct is complained of here. The action was brought pursuant to 42 U.S.C. § 1983,[1] and jurisdiction is predi-

---

1. Although a strained reading of the complaint might reveal the assertion of various pendent claims, the parties agree that plaintiffs have pleaded "seven (7) causes of action, all alleging civil rights violations or violations of certain constitutional rights pursuant to 42 U.S.C. Section 1983 and certain amendments of the United States Constitution." Para. 1, Joint Status Re-

cated upon the provisions of 28 U.S.C. §§ 1331 and 1343. The action was tried to the Court on April 18 and 19, 1984,[2] and the final post-trial submission was received in Chambers on May 21, 1984. The following findings of fact and conclusions of law, mandated by Fed.R.Civ.P. 52(a), represent the Court's resolution of numerous conflicts in the testimony of the several witnesses, based upon an observation of the witnesses' demeanor and an assessment of their credibility.

## II

At about 2:00 A.M. on the morning of July 15, 1980, defendant Valerie Von Dollen was engaged in the performance of her duties as a patrol officer of the City of Albany Police Department. She was accompanied by Officer David Armento, with whom she was riding in a police vehicle designated as "Unit 2." Somewhere in the vicinity of Garden Street in the City of Albany, the officers were signaled to a stop by an unknown operator of an automobile, who told the officers that he was being followed so closely by another automobile that he was fearful for his safety. The officers overtook and stopped the vehicle subject of the complaint in short order. Leaving the police unit, Von Dollen approached the vehicle, an Oldsmobile sedan, on the driver's side, and Armento approached on the passenger's side. Only a driver was seated inside, and although he was not identified by name, he was described by Von Dollen as a small black male who was "very nervous" and "fidgety." He twice was asked for his license and registration, failed to respond, and suddenly drove away from the scene in such a frenzied manner as to occasion a serious risk of harm to Officer Von Dollen. Although the officers gave chase at once, they were unable to locate the Oldsmobile sedan or its driver in the immediate vicinity.

The foregoing events were reported by Officer Von Dollen via radio to Sergeant Thomas Nolan, the vehicle patrol supervisor for Division 2, the police division to which Von Dollen and Armento were assigned. Since the officers had recorded a motor vehicle registration number, they were able to determine that the automobile they sought was registered to Mrs. Terry Keyes, a resident of 97 Third Street in the City of Albany. Pursuant to the direction of Sergeant Nolan, Police Investigator John Tanchak proceeded to 97 Third Street in his police vehicle and located the automobile in question on the street in front of that address. Tanchak touched the hood of the automobile and found it to be "hot," indicating that the motor had been running recently. He reported his findings to Sergeant Nolan, who directed Von Dollen, Armento and Tanchak to converge at 97 Third Street with him at about 3:45 A.M. Also directed to that address were Officers Michael A. Nardolillo and Frank St. Louis of the Arbor Hill Neighborhood Police Squad, who were dressed in special uniforms consisting of green blazer jackets and brown pants. The other officers were attired in traditional blue police uniforms, except for Investigator Tanchak, who was garbed in civilian clothing.

port, filed March 11, 1983. By pre-trial stipulation filed on September 23, 1983, the parties reiterated their agreement that "[t]he basis of Federal Jurisdiction is 42 U.S.C. Section 1983."

**2.** The following witnesses testified at the behest of plaintiffs: Mitchell James Keyes, son of plaintiff Mary Keyes; defendant Thomas Francis Nolan, Sergeant and Patrol Supervisor, Albany Police Department; defendant John Tanchak, Investigator, Albany Police Department; defendant Valerie Ann Van Dollen, Patrol Officer, Albany Police Department; Robert Norris, aged fourteen (eleven at the time of the events testified to), son of plaintiff James Norris; Sherrie Norris, aged sixteen (twelve at the time of the events testified to), daughter of James Norris; defendant Thomas H. Burke, Chief, Albany Police Department; Illamay Norris, aged twenty-one (eighteen at the time of the events testified to), daughter of plaintiff James Norris; plaintiff Mary Keyes; and plaintiff James H. Norris. Michael A. Nardolillo, police officer employed by the City of Albany, was called to the witness stand by defendants. Twenty-one exhibits offered by the plaintiffs were received in evidence.

After the officers identified the Oldsmobile sedan parked in front of 97 Third Street, Sergeant Nolan and Investigator Tanchak walked up the steps to the house, knocked on the door and began a conversation with Mrs. Terry Keyes after she answered the door. During that conversation, Officer Von Dollen observed the man the officers were searching for leave the house by the rear door and climb over the fence and into the yard of the adjoining premises at 99 Third Street owned by plaintiff James Norris. The man later was identified as Mitchell Keyes, husband of Terry Keyes and son of plaintiff Mary Keyes, who resided with Mr. Norris in the house at 99 Third Street. The officers proceeded down the sidewalk, pushed open a gate leading to the front yard of the Norris property and confronted Mr. Keyes, who was at all times visible to the officers. Sergeant Nolan, who was acquainted with Mr. Keyes, identified himself and asked Mr. Keyes if he could speak to him. Mr. Keyes thereupon struck Sergeant Nolan in the chest, pushed him away and ran in the direction of the Norris residence. At about this time, Officers Nardolillo and St. Louis received a radio call for assistance from Officer Von Dollen. These officers had driven their patrol car on Livingston Avenue to the rear of the Mitchell Keyes residence. Officer Nardolillo was stationed in the vehicle and Officer St. Louis was advancing toward the residence at the time of the call. They immediately proceeded to Third Street in the patrol car with siren and lights on and entered the Norris yard through the gate.

A great turmoil then ensued in the Norris yard. The area was lighted to some degree by a street lamp and by flashlights carried by some of the officers. Mitchell Keyes resisted repeated efforts by the officers to take him into custody, and kicks, blows and yells were exchanged with frequency. At some point, Mr. Keyes called out to James Norris for help. Eventually, Mr. Norris was awakened by his children and came out onto the porch of his house and asked the officers to leave his property. At their request, he placed in a cage three dogs (two belonging to him and one belonging to Mitchell Keyes) that were running and barking in the yard. The officers then instructed him to return to the house, but he remained in the doorway on the porch. The three Norris children, Illamay, Sherrie and Robert, ran into the yard and were able to observe many of the events transpiring there, although the police officers encouraged them to leave the area.

Plaintiff Mary Keyes, awakened by the barking of dogs, also entered the yard from the house where she resided with Mr. Norris. She observed her son, Mitchell, surrounded by police and getting the worst of it in the fray. The altercation continued in various sections of the Norris grounds and ended when Sergeant Nolan and Investigator Tanchak were able to subdue Mitchell Keyes by handcuffing him after placing him against the hood of a red automobile parked behind a truck in the yard.[3] At that point, while the officers were in the process of bringing Keyes under control, Mary Keyes stood behind the officers and asked what they were doing to her son.[4] In response, she was struck on the left side of her forehead by a five cell, foot long metal flashlight approximately two inches in diameter, wielded by Officer Von Dollen. The blow was of sufficient force and sever-

---

**3.** Mitchell Keyes required medical treatment for the injuries he sustained in the exchange. It appears that several charges were filed against him as the result of his activities on July 15, 1980, that he was convicted of resisting arrest, and that he served a jail sentence, although the evidence is not entirely clear as to these matters. Mr. Keyes had a criminal record and, apparently, was known to Sergeant Nolan because of his past criminal activities.

**4.** Testimony that Mrs. Keyes clubbed Investigator Tanchak with a stick and that she pulled on Sergeant Nolan's neck is rejected as lacking in credibility. There was, in any event, no testimony that she was able to deflect the officers from their duties, since she was then fifty-one years of age, was 4'11" tall and weighted 115 pounds. The officers involved, including Officer Von Dollen, were much larger in physical size than Mrs. Keyes. Also rejected is testimony that James Norris had "a long gun" in his hands at some point in the disturbance.

ity to cause immediate and extensive bleeding, swelling and dizziness. Mrs. Keyes was assisted in returning to the house by Illamay Norris, who attempted to stop the bleeding. Shortly thereafter, she was driven to Memorial Hospital in Albany by Albert Norris, eldest child of plaintiff James Norris. Her treatment at the hospital emergency room included a tetanus shot.

Apparently, Mrs. Keyes told hospital personnel of the circumstances of her injury and complained of her treatment at the hands of the police officers. A telephone call then was made by hospital authorities to police headquarters, resulting in the appearance of Investigator Tanchak at the emergency room. Upon his arrival, at about 5:15 A.M., he arrested Mrs. Keyes without a warrant on a charge of assault in the second degree, in violation of N.Y. Penal Law § 120.05(3).[5] After being taken into custody, Mrs. Keyes was transported immediately to Division 2 for processing. She was arraigned on the same day in Albany Police Court on the assault charge and was incarcerated for several hours before posting bond at approximately 3:00 P.M. on July 15, 1980. Ultimately, she pleaded guilty, with the assistance of counsel, to a reduced charge of disorderly conduct in violation of N.Y. Penal Law § 240.-20. Mrs. Keyes received further treatment for her injuries on July 16th, 25th and 29th and on August 5th, 1980, and her total medical expenses were approximately $145.00. The only residual effect of her injury is a small and almost imperceptible permanent scar on the left side of her forehead.

### III

The threshold inquiry in a § 1983 case is twofold. The Court must consider whether the conduct complained of was committed by a person acting under color of state law as well as whether that conduct deprived a person of rights, privileges or immunities guaranteed by the constitution. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). There is no question that the individual defendants, in their capacities as officers of the City of Albany Police Department, acted "under color of state law." *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The issue before the Court, then, is whether or not any action of the defendants served to deprive plaintiffs of any of their constitutional rights.

In a § 1983 action the burden is on the plaintiff to prove by a preponderance of the evidence that conduct of the defendant "caused him to be subjected to a deprivation of constitutional rights." *Duchesne v. Sugarman*, 566 F.2d 817, 831 (2d Cir.1977); *see also Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976). The complaint in this action invokes the provisions of the fourth, fifth and fourteenth amendments. Specifically, however, the conduct for which the plaintiffs seek compensatory and punitive damages relates to the entry of the officers on the Norris property, the use of vile lan-

---

**5.** The felony complaint filed in the Albany Police Court by Investigator Tanchak was received in evidence as Plaintiffs' Exhibit 21. The complaint names both Mary Keyes and Mitchell Keyes as defendants and states as follows: "on July 15, 1980, about 3:50 AM., in the front yard of 99 Third St., Albany, New York the defendants did kick your deponent about the body, punched him, grabbed by the throat [sic], causing physical injury in suntantial [sic] pain." However, the felony arrest report furnished to the Albany County District Attorney's Office by Investigator Tanchack with respect to Mary Keyes contained the following version of the events:

The defendant did at about 3:50 AM on 7/15/80 while in the front yard of 99 Third Street jump on the officers [sic] backs as they were attempting to arrested [sic] one Mitchell KEYES. She did intentionally attempt to pre- [sic] a Police Officer from performing a lawful duty. She did grab the officer by the throat wrenching his neck and causing a sore left shoulder to the left side. She did then go to the rear yard and released six dogs on the officers telling the dogs to bite the officers and kill them. She then jumped the officers again and a minimum amount of force was used to stop her causing her to sustain an injury to the left side of her head.

District Attorney's Office, Albany County Felony Arrest Report dated 7/15/80 by Investigator John Tanchak.

guage by the officers, the assault upon, and arrest of, Mary Keyes and the lack of training and supervision of the officers involved.

## IV

### The Specific Claims

#### A. Entry of the Norris property

■ The warrantless entry of a home by police officers for the purpose of making an arrest predicated upon probable cause is proscribed, unless exigent circumstances for the entry are demonstrated. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). While the term "exigent circumstances" never has been clearly defined, it has been held that the "hot" or immediate pursuit of a fleeing felon justifies the warrantless entry of a home in which the felon seeks refuge. *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). "[A]lthough no exigency is created simply because there is probable cause to believe that a serious crime has been committed, ... application of the exigent circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense ... has been committed." *Welsh v. Wisconsin*, — U.S. —, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (warrantless arrest of defendant in the privacy of his own bedroom for non-criminal traffic offense barred by fourth amendment in absence of continuous pursuit or threat to public safety or need to preserve evidence).

■ An illustrative list of various factors to be considered in determining the presence of exigent circumstances has been suggested to include:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect

will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. Reed*, 572 F.2d 412, 424 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978) (applying standards announced in *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C.Cir. 1970)). Other relevant factors may also be considered, and all the circumstances of a particular case must be examined to arrive at the necessary finding of urgency for the warrantless entry. *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100 (2d Cir. 1982).

■ The question of whether the protection afforded to the curtilage, the area associated with and immediately surrounding the home, is the same as that afforded to the home itself remains unresolved. *Oliver v. United States*, — U.S. —, 104 S.Ct. 1735, 1742 n. 11, 80 L.Ed.2d 214 (1984) ("Nor is it necessary in this case to consider ... the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself."). It is well settled, however, that "courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." 104 S.Ct. at 1742 (holding that the "open fields" doctrine established in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), permitting warrantless entry and search of fields by police officers, is consistent with the fourth amendment). Obviously, therefore, exigent circumstances would permit entry without a warrant of a yard immediately adjacent to a home, *United States v. Martino*, 664 F.2d 860, 869 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982) (compelling circumstances found to permit entry to prevent removal or destruction of evidence), and there is a lesser expectation of privacy where illicit activities are carried on in an area exposed to public view, *United States*

*v. Lace,* 669 F.2d 46 (2d Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982).

■ Considering all the relevant factors surrounding the pursuit and apprehension of Mitchell Keyes, it is the conclusion of this Court that there was an urgent need on the part of the police for their entry into the enclosed yard of James Norris and that the entry was justified by the exigent circumstances of the situation. Mitchell Keyes had driven his automobile from the place where he had been stopped on Garden Street in such a sudden and reckless manner as to endanger the safety of Officer Von Dollen. The police officers there-fore had probable cause to arrest Mr. Keyes for the crime of reckless endangerment in the second degree, a violent offense punishable by one year imprisonment under the provisions of N.Y. Penal Law § 120.20,[6] and they sought to arrest him for that crime. Mr. Keyes was pursued closely, immediately and continuously from the moment of his abrupt departure from the scene by the officers who stopped him, as well as by other officers assigned to assist. He finally was located and identified as he vaulted the fence separating his property from the James Norris yard. The fence surrounding the yard was low enough that Mr. Keyes was clearly visible from the street at all times. The plaintiffs seek to persuade the Court that Mr. Keyes somehow acquired "sanctuary" by entering the yard and yelling to Mr. Norris for assistance, and that the pursuit and apprehension of Mr. Keyes in the Norris yard impinged on the constitutional protections afforded to Mr. Norris. Such propositions must be rejected. There was every likelihood that Mr. Keyes would continue his efforts to evade apprehension, and the act of the police in pushing open a gate and entering the yard area to make the arrest constituted a minimal intrusion under the circumstances. When viewed in conjunc-

tion with a lesser expectation of privacy in the curtilage than in the home, there was no fourth amendment violation by the entry here.

### B. *The assault on Mary Keyes*

■ Application of undue force by law enforcement officers deprives an individual of the fourteenth amendment right to be secure in his person and thus represents a deprivation of liberty without due process of law. *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981); *Reed v. Philadelphia Housing Authority,* 372 F.Supp. 686, 689 (E.D.Pa.1974). "The elementary requirements of a use of force rule under § 1983 must be that it neither permits 'brutal police conduct.' *Rosenberg v. Martin,* 478 F.2d 520, 526 (2d Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973), nor allows such 'application of undue force' that the police conduct 'shocks the conscience.' *Johnson v. Glick,* 481 F.2d 1028, 1032, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (holding that a § 1983 action lies by a prison inmate for an unprovoked attack by a guard)." *Jones v. Marshall,* 528 F.2d 132, 139 (2d Cir.1975).

■ In determining whether excessive force has been applied, a court is required to "analyze such factors as 'the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort ... or maliciously or sadistically....'" *Jones v. Marshall,* 528 F.2d at 139 (quoting *Johnson v. Glick,* 481 F.2d at 1033). Here, the force applied to Mary Keyes by Officer Von Dollen was unprovoked, unnecessary and clearly excessive. In fact, there was no need for the application of any force whatsoever, since Mrs. Keyes merely was inquiring about what was happening to her son. Although

---

**6.** N.Y. Penal Law § 120.20 provides as follows: A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person.

Reckless endangerment in the second degree is a Class A misdemeanor

According to N.Y. Penal Law § 70.15(1) a Class A misdemeanor is punishable by a maximum sentence of imprisonment for one year.

she may have been too close to the melee to satisfy the police, and although the police officers present may have wished to remove her from the scene because of a perceived interference with their work, there were means available to accomplish the removal of this small middle-aged woman other than a malicious and brutal stroke on the forehead with a five cell metal flashlight.[7] The nature of the injury, a cut from which there was profuse bleeding, manifested force of such severity as to shock the conscience.

Judgment for Mary Keyes will be directed on this claim. For her injuries, pain and suffering, medical expenses, permanent scar and constitutional deprivation, the Court awards Mrs. Keyes the sum of $5,000.00 in compensatory damages against defendant Valerie Von Dollen alone, there being no indication that any of the other officers present participated in, or even were aware of, the battery of Mary Keyes. The Court finds that no purpose would be served by the award of punitive damages against Officer Von Dollen and, in the exercise of discretion, no award of such damages will be made.

### C. The arrest and detention of Mary Keyes

■■■■■ "The constituent elements of a cause of action for false imprisonment are the detention or restraint of one against his will, and the unlawfulness of such detention or restraint, and the plaintiff must establish such constituent elements by a fair preponderance of the credible evidence in order to recover for false arrest and imprisonment." 22 N.Y.Jur. *False Imprisonment* § 3 at 409 (1962) (footnote omitted). In order for a plaintiff to prevail on such a state tort claim, he must show that defendant intended to confine him, that he was conscious of confinement and that the confinement was not privileged. *Broughton v. State of New York*, 37 N.Y.2d 451, 456–57, 373 N.Y.S.2d 87, 93, 335 N.E.2d

310, 313, *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). The same elements must be established to prove constitutional claims of unreasonable seizure and of due process deprivation grounded in false arrest and asserted under the provisions of 42 U.S.C. § 1983. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). However, a § 1983 claim for false arrest or false imprisonment is barred by a plea of guilty, just as the state claim is similarly precluded. *Griffen v. City of Mount Vernon*, 553 F.Supp. 1047, 1049 (S.D.N.Y.1983); *Pouncey v. Ryan*, 396 F.Supp. 126, 127 (D.Conn.1975); 22 N.Y. Jur. *False Imprisonment* § 48. Here, for whatever reason, plaintiff Mary Keyes entered a plea of guilty to disorderly conduct, and her § 1983 false arrest claim is barred because of that plea.

### D. The use of vile language

■■■■■ Plaintiffs assert that the police officers, during the course of their activities in the Norris yard, directed a stream of verbal abuse, including vile language and racial epithets, at plaintiff James Norris and the Norris children. There is no need to make any factual determination as to the truth or falsity of these allegations, for they do not rise to the level of a constitutional deprivation in any event. "Not every push or shove" violates a person's constitutional rights, *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), and the use of vile and abusive language, no matter how abhorrent or reprehensible, cannot form the basis for a § 1983 claim, *Bolden v. Mandel*, 385 F.Supp. 761 (D.Md.1974); *Ashenhurst v. Carey*, 351 F.Supp. 708 (D.N.Ill.1972); *Johnson v. Hackett*, 284 F.Supp. 933 (E.D. Pa.1968).

### E. The claims for lack of supervision and training

■■■■■ Although claims for constitutional deprivations visited pursuant to gov-

---

**7.** Officer Van Dollen testified that she "thought" she struck Mrs. Keyes in the arm with her flashlight. The evidence that she in fact struck Mrs. Keyes on the forehead with the flashlight is clear and most convincing.

**1156**

ernmental policy, custom, ordinance, regulation or decision may give rise to municipal liability, such liability may not be imposed under a theory of respondeat superior. *Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2nd Cir. 1983). Where a municipality, through its officials, acquiesces in a pattern of illegal conduct, an official policy will be perceived. *Turpin v. Mailet,* 619 F.2d 196 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Moreover, gross negligence or deliberate indifference in failing to train or supervise police officers may give rise to liability on the part of a municipality or its supervising officials for police misconduct, but a causal link between the failure to train or oversee and the constitutional violation must be demonstrated. *Hays v. Jefferson County, Kentucky,* 668 F.2d 869 (6th Cir.), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982); *Owen v. Haas,* 601 F.2d 1242 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

▮ No evidence was presented in this trial to demonstrate any official policy or custom of the City of Albany causing the plaintiffs to be subjected to a denial of constitutional rights. Also lacking in the evidence was any showing of a pattern of previous police misconduct. The only witness to testify regarding police training and supervision was Chief Burke, and his testimony provided no basis for any claim of gross negligence or deliberate indifference with respect to these matters. On the contrary, the Chief described basic and in-service training programs designed to familiarize Albany police officers with the proper methods of performing their duties in a constitutional manner. In light of the foregoing, and in the absence of any personal involvement by Chief Burke in the events at the Norris yard, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), the claims pleaded against the City of Albany and Thomas Burke will be dismissed.

### F. *The equal protection claim*

▮ "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). An equal protection deprivation therefore will be found when racial animus inspires police misconduct. *See Harris v. Harvey,* 605 F.2d 330, 338 (7th Cir.1979), *cert. denied,* 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980). The plaintiffs are black citizens of the City of Albany. Although plaintiffs have adduced some evidence of the use of racial epithets by some of the defendants, the Court finds that there is no solid evidentiary support for a finding of racial animus on the part of any defendant as against either plaintiff, and the claim will be dismissed.

### V

Entry of judgment in favor of plaintiff Mary Keyes against Valerie Von Dollen in the sum of $5,000.00 on her constitutional claim for compensatory damages for the use of excessive force is directed. Judgment shall enter in favor of defendant Valerie Von Dollen on all other claims asserted against her by the plaintiffs in this action. Entry of judgment is directed in favor of the remaining defendants on all claims pleaded against them by the plaintiffs.

It is So Ordered.