## Commonwealth *v.* Duerr, Appellant.

Argued November 19, 1945. Before BALDRIGE, P. J., RHODES, RENO, DITHRICH, ROSS and ARNOLD, JJ. (HIRT, J., absent).

*Louis Little,* with him *Henry Kaufman,* for appellant.

*William J. O'Donnell,* Assistant District Attorney, with him *Russell H. Adams,* District Attorney, for appellee.

*Samuel Gorson,* for Pennsylvania State Lodge Fraternal Order of Police, amicus curiae.

*Andrew J. Hagan* and *Charles B. Prichard,* for Grand Lodge, Fraternal Order of Police, amicus curiae.

OPINION BY BALDRIGE, P. J., January 18, 1946:

William C. Duerr, the Chief of Police of Stowe Township, Allegheny County, was convicted of involuntary manslaughter. This appeal, taken after sentence was imposed, raises inter alia the question of the right of this police officer, attempting to make an arrest without a warrant, to shoot and kill two persons whom he suspected of being felons, but who were, in fact, innocent.

An officer, whose duties include the preservation of the peace and the prevention of crimes, is under the peculiar protection of the law, but in the discharge of his official duties he must act within the authority conferred upon him by law, that is to say he is required to exercise such judgment that will not convict him of having a reckless disregard of his official duty. When he exceeds that authority his official cloak will not protect him from punishment. An arrest, not unlawful in itself, may be performed in a manner so improper or criminal as to make the officer guilty of involuntary manslaughter, or even of a higher crime as the circumstances of the case may vary.

We will confine ourselves to a consideration of the issues raised in this appeal, but, as will be observed, they involve principles of criminal law that have a wide application. Before entering into a discussion of these legal questions it will be helpful for an understanding of this case to state in some detail the salient features of the evidence, which are included in an agreed statement of facts in lieu of printing all the record.

On the evening of June 9, 1944, Samuel J. Riddle, sergeant of the county detectives of Allegheny County, and Julius Trombetta, a member of the Pennsylvania State Police, informed the defendant of the stealing and burning of automobiles in Stowe Township, and asked his aid in apprehending the guilty persons. About 2:00 a. m. the next morning Duerr learned that two boys had been arrested, charged with stealing automo-

biles and would be taken to the township police station. He went there and about 4:00 a. m. that morning Alvin Logue, one of the boys arrested, was brought in by an officer. Defendant learned from Logue that he and two other boys, named Pagan and Creese, had stolen automobiles in that neighborhood and of an engagement to meet these boys at 6:00 a. m. that morning at Keverline's store, near Calvary Cemetery. He gave to Duerr and Riddle a description of, and other information concerning, them. Logue said that he and his associates had stolen a Buick car, which they abandoned. Duerr and Officer Trombetta immediately drove to the place designated and recovered the car. In pursuance of arrangements made after Logue's confession, six officers, all in civilian clothes with the exception of one and there was nothing to indicate that he was an officer except the insignia on his left shirt sleeve near the shoulder reading "Stowe Township Police," in two civilian cars bearing no official insignia or other identification, arrived at or near the Keverline store shortly before 6:30 a. m. Duerr sat next to the driver, a civilian, and two officers were in the back seat. Their car stopped about 260 feet east of the Keverline store and the other car, driven by detective Riddle, parked in the cemetery lane about 125 feet west of the store, or 385 feet from the Duerr car. In this position the officers and Logue, who was in the Riddle car, were awaiting the appearance of Pagan and Creese.

About 6:30 a. m. an automobile, containing two men who it later developed were Ralph Landefeld and Edwin N. Schuler, stopped a short distance below Keverline's store and then proceeded toward the Duerr car. Duerr directed the driver of his car to block the road. When Landefeld, who was driving the approaching car, saw the barrier he put his car in reverse and backed toward the store. At that moment Officer Petrilli, an occupant of the rear seat of the Duerr car, jumped out and ran toward the Landefeld car shouting "wait a minute, fel-

lows." Landefeld kept on retreating and Petrilli continued his pursuit. When Landefeld came to the store he backed into a driveway and started westward toward the Riddle car. As he was turning Petrilli jumped on the running board of the Landefeld car and he testified that he said: "Pull over, fellows, you're under arrest;" that they told him to "get the hell off" and tried to dislodge him. In the meantime, Colbert, the other policeman in the Duerr car, ran after Landefeld's automobile and testified that he shouted: "Stop, Police." According to Landefeld's statement, made immediately after the shooting, it appeared that neither he nor Schuler heard these statements made by the officers. Riddle and his party became aware of the commotion and tried to stop Landefeld's car. They drove along its side, collided two or three times, and soon locked bumpers, causing both to stop. Duerr, whose car had approached the colliding cars, saw Landefeld and Schuler jump out of their car and run into a nearby dairy, and he chased after them. The young men entered the side door of the dairy, ran through a couple offices, and down the steps into the basement. Duerr was in hot pursuit, not far behind. Crone saw Duerr with a revolver in his hand and shouted "don't shoot." Riddle, who was at the side of the building passing one of the windows, also saw Duerr with his revolver in his hand pursuing the two men and he shouted: "For God's sake, don't shoot." The windows were open about two inches, but defendant denies that he heard Riddle's or Crone's warnings. Duerr, when about at the bottom of the steps, fired the first shot, which entered the body of Landefeld. About eleven and one-half feet beyond the bottom of the steps, where there was plenty of light, he fired the second shot which entered the body of Schuler, when he was close to a large open garage door. Schuler pitched forward and died almost instantly. Duerr said to Landefeld: "Why didn't you stop, we are the police." He replied: "Policemen hell, highwaymen." Landefeld's mother, who lived

nearby, came to the scene and her son said to her: "Mom, we were being held up." He died a few days after the shooting. It appeared that both of these men who thus lost their lives were innocent.

Duerr was arrested, charged with murder and voluntary manslaughter. After the evidence was in, the jury was instructed by the trial judge to find the defendant "not guilty" of murder and left it to determine whether he was guilty of voluntary manslaughter. The jury found him not guilty of that charge. Thereafter he was brought to trial on the two indictments before us, each charging involuntary manslaughter. At the beginning of the second trial the defendant entered a plea to each indictment of autrefois acquit. The commonwealth offered in evidence the record of the previous trial, admitted the defendant was the same person and filed a demurrer to each, which was sustained. Thereupon the defendant renewed his pleas of autrefois acquit in the statutory form under section 30 of the Act of March 31, 1860, P. L. 427, 19 PS §464. The trial judge properly refused to entertain this plea on the ground that it had already been disposed of on the demurrer.

Little need be said in support of the correctness of this ruling as it has been decided adversely to appellant's position in *Commonwealth v. Greevy,* 271 Pa. 95, 114 A. 511. The defendant there, as here, was charged with murder and voluntary manslaughter and was acquitted. Subsequently, he was indicted for involuntary manslaughter for killing the same person named in the prior indictment, for which offense he was convicted. On the day of the trial of the last indictment a special plea was filed, alleging that the facts necessarily involved in the first case were essential to prove his guilt of involuntary manslaughter. The Supreme Court held the verdict of acquittal on the charge of murder did not prevent the later prosecution for the same killing on an indictment charging involuntary manslaughter. In the course of its opinion, p. 100, it cited with approval the quotation

from *Hilands v. Commonwealth,* 114 Pa. 372, 6 A. 267: " 'It does not follow because the crime charged may not in law amount to felonious homicide, that it may not constitute a misdemeanor, and be punishable as involuntary manslaughter. The failure of the Commonwealth to convict of the higher crime does not preclude her from establishing a lesser crime, even though arising from the same state of facts. The evidence necessary to establish involuntary manslaughter is essentially different from that required to support an indictment for murder.' " The court also held in the *Greevy* case at page 104, that the burden of proof to sustain the plea of former acquittal was on the defendant, who offered no evidence to sustain it. He offered the record in the murder case when he filed his special plea, but he did not even do this at the trial. It was argued that the jury was bound to return a verdict on the plea of former acquittal as well as on that of not guilty. The court held " . . . the question was then res adjudicata; had the trial judge's attention been called to the plea, he would have been compelled to instruct the jury that the verdict thereon must be in favor of the Commonwealth; . . ." See, also, *Commonwealth v. Moon,* 151 Pa. Superior Ct. 555, 30 A. 2d 704, and cases cited page 560. Those cases dispose of appellant's first two assignments of error.

His third assignment of error complains of the court's charge. The part especially criticized reads as follows: "The notion that a peace officer may in all cases shoot one who flees from him when about to be arrested is unfounded. Officers have no such power except in cases of felonies and there, as a last resort, after all other means have failed. It is never allowed, where the offense is only a misdemeanor and where there is only a suspicion of felony, the officer is not warranted in treating the fugitive as a felon. If he does this, he does so at his peril, and is liable if it turns out that he is mistaken. An officer may lawfully arrest upon a suspicion of felony, but he is only warranted in using such

force in making the arrest as is allowable in other cases not felonious, unless the offense was, in fact, a felony . . . The right of an officer to kill an escaping felon is limited to cases in which the officer knows that the person whom he seeks to arrest is a felon, and not an innocent person . . . Here, in this case, the evidence is to the effect that Mr. Schuler and Mr. Landefeld had not committed the felonies, and, therefore, if you believe that evidence, the shooting and killing of Landefeld and Schuler by this defendant is not excused by the law."

Although we have found no clear-cut rule announced by the appellate courts of this commonwealth on the right of an arresting officer to use deadly force against one suspected of committing a felony, as opposed to one actually known to have committed a felony, the legal principles announced by the trial judge are sustained by clear implication in our own cases, those in other jurisdictions, and by many authorities generally. We might state at this point that we do not question the correctness of the contention advanced in the brief of the Grand Lodge Fraternal Order of Police, filed as amicus curiae, that a peace officer may arrest one upon the reasonable suspicion of a felony without a warrant *(McCarthy v. DeArmit,* 99 Pa. 63), and that he is not always bound to give the party to be arrested notice that he is a legally qualified officer and of his purpose to make an arrest, although in most cases it may be prudent to do so: *Commonwealth v. Long,* 17 Pa. Superior Ct. 641; *Shovlin v. Commonwealth,* 106 Pa. 369, 372. A private person present when a felony is committed may also arrest a felon without a warrant. Otherwise, society would be in danger as it is often necessary that a felon who is about to commit a robbery, murder, etc., be arrested on the spot or allowed to escape: *Brooks v. Commonwealth,* 61 Pa. 352.

The generally recognized rule is that an officer endeavoring to make an arrest in cases of felony, may use all the force necessary to overcome resistance, even to

taking the life of a resisting offender. However, even a felon cannot be killed in an effort to arrest him without criminal responsibility, unless he cannot otherwise be captured: *Commonwealth v. Micuso,* 273 Pa. 474, 477, 117 A. 211. The right to kill an escaping offender is limited to cases in which the officer knows that the person whom he is seeking to arrest is a felon and not an innocent party. Mere suspicion that a felony has been committed will not justify the killing to prevent the escape of one suspected of the crime. The officer in that event acts at his peril and he will be liable if it is shown that no felony was in fact committed: 4 Am. Jur., Arrest, §80; 26 Am. Jur., Homicide, §235.

"Except where he acts in self-defense, neither an officer, nor a private person, in making an arrest without a warrant on suspicion of a felony, is justified in killing the suspect in order to effect an arrest, no matter how reasonable the grounds of suspicion may be, unless a felony has actually been committed." 6 C. J. S., Arrest, §13. In other words, suspicion under which he acted must prove to have been correct.

Sadler on Criminal Procedure in Pennsylvania, 2nd Ed., §88, p. 92, states that while a police officer may arrest without a warrant on suspicion based on reasonable grounds, he is not justified in using deadly weapons to effect the capture of the suspect unless the actual commission of a felony be shown. No Supreme Court authorities are given to support the text, but the following lower court decisions are cited: *Commonwealth v. Greer,* 20 Pa. C. C. 535, and *Commonwealth v. Megary,* 8 Phila. 616. See, also, Wharton on Homicide, 3rd Ed., §489, p. 737, which holds that where no process is issued a homicide by an officer seeking to make an arrest, can only be justified by showing the actual commission of a felony, and that there was positive necessity to take life in order to arrest or detain the felon. See, also, *Conraddy v. People,* (N. Y.), 5 Parker's Criminal Reports 234; Warren on Homicide, perm. ed., Vol. 1, §145, pp. 628,

629, note 65. The rule thus recognized by these legal authorities is approved in Restatement of the Law, Torts, §131. It is laid down there that the use of force against another to make an arrest by the use of means intended, or likely, to cause death, is privileged only if the arrest is made for treason or felony, which normally causes or threatens death, or serious bodily harm, or which involves the breaking and entering of a dwelling place.

One of the leading cases, and with facts similar to those before us, is *Wiley v. State*, 19 Ariz. 346, 170 P. 869, L. R. A. 1918D 373. Wiley, a deputy sheriff, was patrolling the highway in company with another deputy looking for persons who had committed a robbery at a nearby amusement park. They saw a car down the road turn around and proceed in the opposite direction. They pursued and fired shots bringing the car to a halt. One of the shots killed the driver's wife, who was sitting beside him on the front seat. A verdict of murder in the second degree was affirmed by the Supreme Court. The court there held there was no justification for an officer killing a person who fled from him, when the officer was acting on suspicion and no felony had in fact been committed. See, also, *Young v. Amis*, 220 Ky. 484, 295 S. W. 431; *Johnson v. Chesapeake & Ohio Ry. Co.*, 259 Ky. 789, 83 S. W. 2d 521.

The appellant strongly asserts that authorities to which we have referred are not applicable as he knew a felony in the form of larceny of certain automobiles had been committed, so that he brought himself within the rule that where a felony has been committed the killing by an officer of one who has attempted to flee arrest, is justified homicide. The fallacy of that argument is quite apparent. The felony in question must have been committed by the person whom the officer is presently seeking to arrest. Otherwise, if a felony has been committed in the community an officer could shoot and kill an entirely innocent person, whom he might suspect of being a felon as in this case.

494

A review of the judge's charge, which was clear and comprehensive, carefully safeguarded all the defendant's rights and fails to convince us that the appellant has just cause to complain of the instructions given to the jury. None of the assignments of error are sustainable.

The judgments of the court below are affirmed, and it is ordered that appellant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with his sentence or any part of it that had not been performed at the time the appeal was made a supersedeas.