**STATE of Alaska, Petitioner,**

v.

**Russell SUNDBERG, Respondent.**

**No. 4397.**

Supreme Court of Alaska.

May 9, 1980.

Barry J. Stern, Asst. Atty. Gen., Daniel W. Hickey, Chief Pros., Avrum M. Gross, Atty. Gen., Juneau, for petitioner.

John M. Murtagh and Walter Share, Asst. Public Defenders, Brian Shortell, Public Defender, Anchorage, for respondent.

Robert H. Wagstaff and Louis James M. Menendez, Anchorage, for Alaska Civil Liberties Union as amicus curiae in support of respondent.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This petition for review raises the propriety of the superior court's adoption of an exclusionary rule as a sanction against the use of excessive force by the police in effectuating an arrest of a fleeing burglary suspect. We conclude such a rule should not have been applied and reverse.

The relevant facts are as follows. On the night of April 30, 1978, Anchorage Police Officer Jack Bohannon, driving a marked patrol car, responded to a police dispatch reporting a burglary in progress at a pharmacy in a medical office building. The information relayed by the dispatch was that there were two suspects one being possibly a black male. When Officer Bohannon arrived at the scene of the reported burglary, he noted the presence of a private security guard and another police patrol car. He had also observed a third patrol car a short distance away on its way to the scene.

Officer Bohannon saw a suspect near a broken window of the pharmacy carrying a blue hat and a pillow case as a sack. The suspect dropped the pillow case on the sidewalk and began to run down the sidewalk away from Bohannon. Carrying a 12-gauge riot shotgun loaded with buckshot, Bohannon pursued the suspect on foot around the corner of the building for about fifteen or twenty feet, and shouted, "Hold it, police officer." Bohannon did not warn the suspect that he had a weapon and would shoot if the suspect failed to stop.

Bohannon decided that he could not outrun the suspect, stopped, and fired at the suspect with his shotgun from a distance of approximately fifty yards. In accordance with police department policy, Bohannon had not fired a warning shot. One shotgun pellet struck the suspect in the back of the foot and another pellet struck him in the upper thigh. The suspect immediately fell to the ground.

Bohannon quickly reached the suspect and several other police officers arrived at that location within a minute or so. The suspect was searched and a box containing forty-two nine-millimeter cartridges was found in his pocket. A subsequent search of the pillow case which had been dropped by the suspect revealed drugs and other items which had been taken from the pharmacy. The suspect was arrested, questioned, and identified as Russell Sundberg, the respondent in this case.

Two days later, a nine-millimeter semi-automatic handgun with seven cartridges in its clip and one cartridge in its chamber was found on the roof of a building near the pharmacy. This rooftop location was above the place where Sundberg had fallen after being shot, and the cartridges in the handgun found there were the same type as those found on Sundberg's person when he was apprehended. While Sundberg's fingerprints were not on either the handgun or the cartridges, the superior court concluded that Sundberg had been armed at the time of the burglary and his subsequent flight.

However, Officer Bohannon did not testify to any facts which indicated that he perceived Sundberg to be armed at the time of the chase, nor did he testify that he saw Sundberg either reach for or discard a weapon, though the street was well lit. Accordingly the superior court found that "nobody perceived [Sundberg] to be armed" at the time of the shooting and arrest.

In the superior court, Sundberg moved to suppress any evidence obtained by his arrest, including statements made by him, his clothes and other evidence obtained in the search made incident to his arrest, and the identification of him accomplished after he was arrested. Sundberg asserted that his arrest was unlawful because excessive force had been used to accomplish it. He argued that Alaska's statutory scheme, AS 12.25.-080, detailing the means permissible to effect an arrest is unconstitutional, if interpreted to allow the use of deadly force to arrest a fleeing felon who is not threatening the life of another. His argument invoked constitutional doctrines concerned with due process, equal protection, cruel and unusual punishment, and unreasonable searches and seizures.

In a memorandum opinion, the superior court interpreted AS 12.25.080 to prohibit the use of deadly force by a police officer to arrest a fleeing felon unless the officer had "a reasonable belief that the [fleeing felon] was threatening the use of deadly force against either the officer himself, the victims of a crime, or innocent bystanders." The superior court alternatively held that, if not so interpreted, the statutory scheme

violated Alaska's constitutional guarantee against "unreasonable searches and seizures."[1] Subsequently the superior court entered an order "suppressing the results of the search which took place pursuant to what . . . [it] believe[d] was an unreasonable seizure of Mr. Sundberg's body."

The state then petitioned this court for review of Judge Carlson's opinion and suppression order. The state's petition in part asserts the following:

The state can establish that there was a burglary of a pharmacy, that a person was seen fleeing from the pharmacy, and that prior to being arrested that person dropped a pillow case containing drugs and other items taken from the pharmacy. However, with the suppression of the results of the arrest, the critical piece of evidence, the identification of Sundberg made after his arrest as the person fleeing from the pharmacy, is unavailable to the state. The state is unable to establish Sundberg's identity by other means. While the [superior court's] order is framed in terms of the suppression of evidence, its effect is to bar prosecution of Sundberg.

Because of the importance of the legal issues involved, we granted review.

## I   *Historical Background*

The common law developed a highly articulated set of principles of justification for the use of force to prevent crime and effect arrest.[2] These principles are related to and some extent overlap the doctrines of

1. After using a due process interest balancing analysis to give content to this constitutional requirement of reasonableness, Judge Carlson stated:

    In conclusion, I find that the state's interest in deterrence of future crime and effective law enforcement does not outweigh the defendant's constitutionally protected right to suffer no deprivation of life or limb without due process of law. In order for the state's interest to outweigh the individual's interest, the individual must be threatening a competing and equal interest in another person's life or limb. In other words, in the case of a police officer using deadly force against a

fleeing suspect, the police officer must have a reasonable belief that the fleeing suspect is threatening the life of the officer, bystanders, or victims of the crime. In any other circumstance, the use of deadly force to effect an arrest would constitute an unreasonable seizure in violation of the defendant's rights under Article I, section 14 of the Alaska Constitution.

2. For a thorough general discussion of these principles, see Note, *Justification for the Use of Force in the Criminal Law*, 13 Stan.L.Rev. 566 (1961).

self-defense, defense of others, and defense of property.[3]

With regard to crime prevention, one commentator noted:

> The use of force has historically been justified when its purpose is the prevention of a criminal act. Such force is prompted by different motives than when the actor is protecting himself or his property, because the threat is not to a personal interest of the actor but rather to society's general interest in preventing criminal acts. This interest would clearly seem a sufficient justification for force, particularly because the common law justified such force in apprehending the criminal once he had committed the criminal act. Thus the effect of the crime-prevention privilege is to allow a person to use force in preventing a crime, rather than compel him to await the commission of the unlawful act.

Historically, the right to use force in preventing crimes was limited to situations where the threatened act would have constituted a felony or breach of the peace. Consequently, the threatened commission of a non-violent misdemeanor, such as petty larceny, provided no basis for the use of preventive force.[4]

However, in the 19th century, this common law distinction between the prevention of felonies and misdemeanors began to erode, and it became the general rule that "[O]ne who reasonably believes that a felony, or a misdemeanor amounting to a breach of the peace, is being committed, or is about to be committed, in his presence may use reasonable force to terminate or prevent it." [5]

Originally, the common law rule was that the use of deadly force was justifiable whenever the use of such force was necessary to prevent or terminate the commission of any felony. The common law felonies were murder, rape, manslaughter, robbery, sodomy, mayhem, burglary, arson, and prison break, and each of these offenses was punishable by death.[6] While most of these offenses involved danger to the life of others, the justification was based on the rationale that "the law does not allow 'any crime to be *prevented* by death, unless the same, if committed, would also be *punished* by death.' " [7]

With progressive creation of a great number of statutory felonies, few of which were punishable by death or even life imprisonment, this supporting rationale disappeared.[8] As a result, this justification was modified by judicial interpretation and, in some cases, statutes. The general rule that emerged limited the right to use deadly

---

**3.** For a general discussion of these doctrines, see W. LaFave & A. Scott, Criminal Law §§ 53–55 (1972). On self defense in the criminal context, *see also* Beale, *Retreat from a Murderous Assault*, 16 Harv.L.Rev. 567 (1903); Beale, *Homicide in Self-Defense*, 3 Colum.L. Rev. 526 (1903); Perkins, *Self-Defense Reexamined*, 1 U.C.L.A.L.Rev. 133 (1954). With regard to the defense of others and property, *see also* Stumberg, *Defense of Person and Property Under Texas Criminal Law*, 21 Tex.L.Rev. 17 (1942); Note, *The Use of Deadly Force in the Protection of Property Under the Model Penal Code*, 59 Colum.L.Rev. 1212 (1959); Bohlen & Burns, *The Privilege to Protect Property by Dangerous Barriers and Mechanical Devices*, 35 Yale L.J. 525 (1926).

**4.** Note, *Justification for the Use of Force in the Criminal Law*, 13 Stan.L.Rev. 566, 568 (1961) (footnote omitted).

**5.** LaFave & Scott, *supra* note 3, at 406 (footnotes omitted).

**6.** This list applies to felonies recognized in England in 1500 and approximately the same felonies existed in America at the time of the Revolution. T. Plucknett, A Concise History of the Common Law (5th ed. 1956). *See also* Comment, *The Use of Deadly Force in the Protection of Property Under the Model Penal Code*, 59 Colum.L.Rev. 1212, 1217 nn. 26–27 (1959); LaFave & Scott, Criminal §§ 53–55 at 406 (1972); Note, *Justification for the Use of Force in the Criminal Law*, 13 Stan.L.Rev. 566, 577 (1961).

**7.** LaFave & Scott, *supra* note 3, at 406 n. 27, *quoting* 4 Blackstone, Commentaries 182 (1803).

**8.** From 1500–1800 the number of statutory felonies recognized in England increased by over 200. *See* L. Radzinowicz, *A History of English Criminal Law* 151, 153 (1948).

force to prevent only those dangerous felonies which posed a substantial risk of death or serious bodily harm to any person. However, in some jurisdictions the use of deadly force continued to be authorized to prevent at least certain classes of felonies without regard to the danger presented in the specific circumstances.[9]

With respect to the principle of justification involved in the present case, the common law allowed the use of deadly force when necessary to secure the arrest of any felon, with no distinction made between those felonies which did or did not pose a threat of violence. In contrast, there was no right to use deadly force, even though necessary, to arrest a misdemeanant.[10] The rationale was similar to that underlying the original felony prevention standard.[11]

The common law rule authorizing the use of deadly force to effect the arrest of any felony suspect has been almost uniformly criticized by legal commentators for the past fifty years. These commentators, though differing as to details of analysis and formulation, have urged that deadly force is justified only to a arrest a fleeing felon who, either because of the nature of the offense committed or the facts known to the arresting officer, poses a substantial threat to the life or physical safety of others if not immediately apprehended.[12]

In 1962, the American Law Institute, after considerable debate, agreed upon the section, 3.07(2)(b) of the Model Penal Code which provides:

The use of deadly force is not justifiable under this Section unless:

(i) the arrest is for a felony; and

(ii) the person effecting the arrest is authorized to act as a peace officer or is assisting a person whom he believes to be authorized to act as a peace officer; and

---

9. *See, e. g., State v. Waggoner*, 49 N.M. 399, 165 P.2d 122 (1946); *State v. Holbrook*, 98 Or. 43, 188 P. 947 (1920); *Commonwealth v. Emmons*, 157 Pa.Super. 495, 43 A.2d 568 (1945); *State v. Nyland*, 47 Wash.2d 240, 287 P.2d 345 (1955). *See generally* LaFave & Scott, Criminal Law §§ 53–55 at 406–07 (1972); Comment, *The Use of Deadly Force in the Protection of Property Under the Model Penal Code*, 59 Colum.L.Rev. 1212, 1217–18 (1959); Note, *Justification for the Use of Force in the Criminal Law*, 13 Stan.L.Rev. 566, 577–79. *See also* Restatement (Second) of Torts § 143(2) (1965).

10. *See, e. g.*, LaFave & Scott, *supra* note 3, at 405–06; Moreland, *The Use of Force in Effecting or Resisting Arrest*, 33 Neb.L.Rev. 408 (1954); Pearson, *The Right to Kill in Making Arrests*, 28 Mich.L.Rev. 957 (1930); Perkins, *The Law of Arrest*, 25 Iowa L.Rev. 201, 268–73 (1940).

11. Comment, *Deadly Force to Arrest: Triggering Constitutional Review*, 11 Harv. C.R.–C.L. L.Rev. 361, 365–67 (1976) (footnotes omitted).

In contrast with regard to a misdemeanant it was thought, as one court stated:

In such cases it is better, and more in consonance with modern notions regarding the sanctity of human life, that the offender escape than that his life be taken, in a case where extreme penalty would be a trifling fine or a few days' imprisonment in jail. *Klinkel v. Saddler*, 211 Iowa 368, 233 N.W. 538, 541 (1940). *See generally* Note, *The Application of Deadly Force to Effectuate an Arrest*, 5 Washburn L.J. 262 (1966).

12. *See, e. g.*, Sherman, *Execution Without Trial: Police Homicide and the Constitution*, 33 Vand.L.Rev. 71 (1980); Note, *Arrest With and Without a Warrant*, 75 U.Pa.L.Rev. 485, 494–504 (1927); Day, *Shooting the Fleeing Felon: State of the Law*, 14 Crim.L.Bull. 285, 297–301 (1978); Greenstone, *Liability of Police Officers for Misuse of Their Weapons*, 16 Clev.-Mar.L. Rev. 397, 400–05 (1967); Gremel, *When Can a Policeman Use His Gun?* 40 J.Crim.L.C. & P.S. 756, 759–60 (1950); McDonald, *Use of Force by Police to Effect Lawful Arrest*, 9 Crim.L.Q. 435, 451–52 (1967) (urging narrowing of justification in Canada); Moreland, *The Use of Force in Effecting or Resisting Arrest*, 33 Neb.L.Rev. 408 (1954); Pearson, *The Right to Kill in Making Arrests*, 28 Mich.L.Rev. 957, 974–76 (1930); Safer, *Deadly Weapons in the Hands of Police Officers on Duty and Off Duty*, 49 J.Urb.L. 564, 568 (1971); Note, *The Justified Use of Deadly Force*, 4 Crim.L.Bull. 3, 15–20 (1968); Note, *The Civil Liability of Peace Officers for Wounding or Killing*, 28 U.Cin.L.Rev. 488, 494–95 (1959); Comment, *Deadly Force to Arrest: Triggering Constitutional Review*, 11 Harv. C.R.–C.L. L.Rev. 361 (1976); Note, *Justification for the Use of Force in the Criminal Law*, 13 Stan.L.Rev. 566, 582–85 (1961); Note, *Justifiable Use of Deadly Force by the Police: A Statutory Survey*, 12 Wm. & Mary L.Rev. 67, 85 (1970). *See also* President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police 189–90 (1967).

(iii) the actor believes that the force employed creates no substantial risk of injury to innocent persons; and

(iv) the actor believes that:

(1) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or

(2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if apprehension is delayed.

As of 1978, seven states had enacted some version of the Code's approach,[13] and a version of the Model Penal Code has been enacted in Alaska's new criminal code, which became effective January 1, 1980.

## II  Construction of AS 12.25.080

With the foregoing historical overview in mind, we turn next to the first impression question of the proper construction of AS 12.25.080. This statute, which was in force and effect at the time Sundberg was apprehended by Officer Bohannon, provided:

If the person being arrested either flees or forcibly resists after notice of intention to make the arrest, the peace officer may use all the necessary and proper means to effect the arrest.

In the case at bar, the superior court construed AS 12.25.080 in the following manner:

13.  These statutes are:
Del.Code tit. 11 § 467(c) (1974); Haw.Rev. Stat. tit. 37, § 703–307(3) (1976); Ky.Rev. Stat. § 503.090(2) (1975); Me.Rev.Stat. tit. 17A, § 107–2(B) (1975); Nev.Rev.Stat. § 28.-839(3) (1975); Tex.Penal Code Ann. tit. 2, § 9.51(c) (1974); N.C.Gen.Stat. § 15A–401(d)(2)(b) (1975).
Note, *Substantive Due Process and the Use of Deadly Force Against the Fleeing Felon: Wiley v. Memphis Police Department & Mattis v. Schnarr*, 7 Cap.U.L.Rev. 497, 499 n. 13 (1978). *See also* Comment, *Deadly Force to Arrest: Triggering Constitutional Review*, 11 Harv. C.R.–C.L. L.Rev. 361, 368–69 (1976); Note, *Justifiable Use of Deadly Force by the Police: A Statutory Survey*, 12 Wm. & Mary L.Rev. 67, 81–84 (1970).

14.  Article I, § 14 of the Alaska Constitution provides:
The right of the people to be secure in their persons, houses and other property, papers and effects, against unreasonable searches

In other words, in the case of a police officer using deadly force against a fleeing suspect, the police officer must have a reasonable belief that the fleeing suspect is threatening the life of the officer, bystanders, or victims of the crime. In any other circumstance, the use of deadly force to effect an arrest would constitute an unreasonable seizure in violation of the defendant's rights under Article I, section 14 of the Alaska Constitution.[14]

■ We are of the opinion that the superior court correctly rejected a construction of AS 12.25.080 which would have permitted law enforcement personnel to employ deadly force to arrest fleeing suspects under any and all circumstances.[15] In making this ruling the superior court appropriately considered relevant portions of Alaska's new Criminal Code which became effective on January 1, 1980. AS 11.81.370 of the new code provides in part that a peace officer in making an arrest, or terminating an escape, may

(a) [U]se deadly force only when and to the extent he reasonably believes the use of deadly force is necessary to make the arrest or terminate the escape or attempted escape from custody of a person he reasonably believes

(1) has committed or attempted to commit a felony which involved the use of force against a person;

and seizures shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

15.  There is no dispute that Officer Bohannon did use "deadly force" to make the arrest. Though not specifically defined in the then applicable statutes, AS 11.81.900(12) of the new Criminal Code provides:
"[D]eadly force" means force which the person uses with the intent of causing or uses under circumstances which he knows create a substantial risk of causing, death or serious physical injury; *"deadly force" includes intentionally discharging a firearm in the direction of another person or in the direction in which another person is believed to be . . . .* [emphasis supplied].
This definition is similar to that found in the Model Penal Code § 3.11(2) (1962).

(2) has escaped or is attempting to escape from custody while in possession of a firearm on or about his person; or

(3) may otherwise endanger life or inflict serious physical injury unless arrested without delay.

Given the circumstance that AS 11.81.370 is now operative, we believe a construction of the "necessary and proper means" phraseology of AS 12.25.080, which brings these provisions into conformity with contemporary Alaskan values, is indicated.

■ Frequently felony suspects may flee for reasons other than guilt. Whatever the reason, the fleeing suspect has overriding interests involved in these circumstances. As one commentator notes:

The fleeing felony suspect advances two distinct but interrelated interests: the interest in not being deprived of life or limb because he committed a crime (a right to life) and the interest in suffering no deprivation until convicted in a court of law (a right to trial). When deadly force is used to arrest nonviolent felony suspects, these interests give rise to the two fundamental objections against the use of deadly force. The first is that the use of such force merely to arrest for a nonviolent crime is grossly disproportionate and morally wrong. The second objection is that the deprivation of life or limb without trial is offensive to the presumption of innocence and other values central to our conception of justice and should not be condoned except in emergency situations.

Comment, *Deadly Force to Arrest: Triggering Constitutional Review*, 11 Harv. C.R.–C.L.L. Rev. 361, 372–73 (1976). This

first interest is especially compelling in that the death penalty is not available in Alaska. Thus, it is only in situations articulated in AS 11.81.370 that a felon should be subjected to the possibility of summary execution. Approval on our part of more relaxed standards than those provided in AS 11.81.370, would give rise to significant constitutional questions.[16]

Thus, we hold that the criteria embodied in AS 11.81.370 should be looked to as the relevant standards to be applied by Alaska's courts in resolving issues which might still arise under the "necessary and proper means" phraseology of former AS 12.25.080.

### III Appropriateness of the superior court's invocation of the exclusionary rule

■ The foregoing leads us to an examination of the merits of the superior court's imposition of an exclusionary rule and resultant suppression order. We assume arguendo that the record demonstrates that Officer Bohannon used excessive force in effectuating the arrest of Russell Sundberg. Taking this given as our starting point, we address the question of whether the superior court properly invoked an exclusionary rule as a sanction against Officer Bohannon's violation of AS 12.25.080. In the circumstances of this case, we conclude that it was inappropriate for the superior court to have imposed an exclusionary rule.

Initially, we note that there is no legislative directive calling for invocation of an exclusionary rule as a sanction against resort by the police to excessive force in making an arrest (*i. e.*, a violation of AS 12.25.-080).[17] Therefore, in the absence of any compelling legislative history of AS 12.25.-

16. Given the narrow applicability of our holding pertaining to the proper construction of AS 12.25.080, and the fact that AS 11.81.370 became effective on January 1, 1980, we deem it unnecessary to set forth a lengthy explanation of our reasons for adopting the criteria of AS 11.81.370 as appropriate limitations on the "necessary and proper" means phraseology of AS 12.25.080. We deem it sufficient to again note that without the construction of AS 12.25.-080 we have adopted today, this court would entertain grave doubts as to the constitutionality of a statute which permitted peace officers

to employ deadly force against all fleeing felons regardless of the particular circumstances. *See Mattis v. Schnarr*, 547 F.2d 1007 (8th Cir. 1976) *vacated sub nom. Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219, Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 366–67 (1974). Further, it is this court's duty to reasonably construe statutes, whenever possible, to avoid the dangers of unconstitutionality. *Hoffman v. State*, 404 P.2d 644, 646 (Alaska 1965).

17. *See, e. g.*, Ill.Rev.Stat. ch. 38 § 14–5 (1979).

080, we are faced with the policy decision as to whether a judicially created exclusionary rule should be fashioned and employed in the situation where arrests are accompanied by excessive force on the part of the police.[18]

Some measurable consequence should attach in the circumstance where police conduct is violative of a statute and in turn significantly affects substantial rights of the accused.[19] In assessing the significance of the rights involved in the case at bar, we think it relevant to consider the relationship between AS 12.25.080 and the goals of the exclusionary rule as developed in the context of searches and seizures.

The primary purpose of the exclusionary rule is deterrence of future illegal conduct by the police.[20] Assuming that application of an exclusionary rule would provide some disincentive to the use of unlawful force by police officers in making arrests, the question which remains is whether other deterrents render adoption of an exclusionary rule unnecessary given society's interests in the apprehension, prevention, and trial of offenders. Potential deterrents exist in the possibility of criminal sanctions;[21] police departmental proceed-

18. *Compare Ellison v. State*, 383 P.2d 716 (Alaska 1963). We noted that if *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) had not applied the federal exclusionary rule on unlawful searches and seizures to the state, "Alaska would have been free to retain the federal exclusionary rule or adopt the rule which obtained at common law." 383 P.2d at 718.

19. *See* Rule 461, Uniform Rules of Criminal Procedure (Approved Draft 1964); *compare* Model Code of Pre-Arraignment Procedure § SS 290.2(2) (Proposed Official Draft 1975).

20. *State v. Sears*, 553 P.2d 907, 911–12 (Alaska 1976). As to the origins and development of the exclusionary rule, *see, e. g., Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

The deterrent effect of the rule has been strongly disputed. *Compare* Oaks, *Studying the Exclusionary Rule in Search and Seizure*, 37 U.Chi.L.Rev. 665, 709, 775–76 (1970) (deterrent effect questionable based on empirical research) *and* Spiotto, *The Search and Seizure Problem—Two Approaches: The Canadian Tort Remedy and the U.S. Exclusionary Rule*, 1 J. Police Sci. & Ad. 36, 49 (1973) (deterrent effect not demonstrated by empirical study) *with* Cannon, *Is the Exclusionary Rule in Failing Health? Some New Data and a Plea Against a Precipitous Conclusion*, 62 Ky.L.J. 681, 725–26 (1974) (rule fulfills its purpose). *See also* 1 W. LaFave, Search and Seizure § 1.2(b), at 25–30 (1978).

21. *See* Annot., 83 A.L.R.3d 174, 224–30 (1976) (discussing a few such criminal prosecutions). *See also State v. Barr*, 115 Ariz. 346, 565 P.2d 526 (1977); *People v. Wild*, 60 Cal.App.3d 829, 131 Cal.Rptr. 713 (1976); *Commonwealth v. Duerr*, 158 Pa.Super. 484, 45 A.2d 235 (1946). *See generally* Edwards, *Criminal Liability for Unreasonable Search and Seizure*, 41 Va.L.Rev. 621 (1955); Newman, *Suing the Lawbreakers: Proposals to Strengthen the Section 1983 Damage Remedy for Law Enforcer's Misconduct*, 87 Yale L.J. 447 (1978).

At the time of the offense, AS 11.60.350 provided:

*Deprivation of Rights Under Color of Law.* A person who, under color of any law, ordinance or regulation of this state or its political subdivisions, wilfully deprives another person of a right, privilege or immunity granted by the constitution or the laws of this state, or who subjects another person to different punishments, pains or penalties because of that person's race, color, creed or national origin, is guilty of a misdemeanor and upon conviction is punishable by imprisonment for not more than one year, or by a fine of not more than $1,000, or by both.

This offense is now incorporated under AS 11.-76.110 of the new criminal code which provides in pertinent part:

*Interference with Constitutional Rights.* (a) A person commits the crime of interference with constitutional rights if

(1) he injures, oppresses, threatens, or intimidates another person with intent to deprive that person of a right, privilege, or immunity in fact granted by the constitution or laws of this state;

(2) he intentionally injures, oppresses, threatens, or intimidates another person because that person has exercised or enjoyed a right, privilege, or immunity in fact granted by the constitution or laws of this state; or

(3) under color of law, ordinance, or regulation of this state or a municipality or other political subdivision of this state, he intentionally deprives another of a right, privilege, or immunity in fact granted by the constitution or laws of this state.

ings; [22] civil rights actions; [23] and common law tort suits against the offending officer. On the record in this case we are not persuaded that these deterrents are so ineffective that invocation of an exclusionary rule is the only viable alternative.

Further, the conventional search and seizure setting usually involves a relatively static factual circumstance where the object of police efforts is to obtain evidence of criminal conduct. In stark contrast, the fleeing offender—arrest situation normally does not involve intentional police efforts to obtain evidence of criminality. This latter setting often requires law enforcement officials to make rapid decisions within the framework of fluid and confused factual situations which do not permit significant reflection, the obtaining of legal advice, or the intervention of, and decision from, a neutral and detached judicial officer.

Given these considerations and the absence of a history of excessive force arrests by police officers in Alaska, we conclude

that the imposition of an additional exclusionary deterrent would at best achieve only a marginal deterrent effect. Furthermore, we are of the view that imposition of an exclusionary rule on the particular facts of the case at bar was clearly unwarranted. Here the officer had probable cause to make the arrest, was proceeding in accordance with existing departmental directives, and the degree of force permissible under the necessary and proper phraseology of AS 12.25.080 had not been previously construed by this court.[24]

On the other hand, we think it appropriate to caution that our holding is not immutable. In the event a history of excessive force arrests is shown, demonstrating that existing deterrents are illusory, we will not hesitate to reexamine the question of whether an exclusionary deterrent should be fashioned in the situation where evidence is obtained as a result of an arrest which is effectuated by excessive force.[25]

**22.** There is considerable disagreement as to both the present and potential effectiveness of such administrative procedures in determining police violations of individual rights and in imposing meaningful sanction. *See* Report of the National Advisory Commission on Civil Disorders 162–63 (1968); *President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police* 200–05 (1967); W. Gellhorn, *When Americans Complain* 170–95 (1966); Goldstein, *Administrative Problems in Controlling the Exercise of Police Authority*, 58 J.Crim. L.C. & P.S. 160 (1967); McGowan, *Rulemaking and the Police*, 70 Mich.L.Rev. 659 (1972); Schwartz, *Complaints Against the Police: Experience of the Community Rights Division of the Philadelphia District Attorney's Office*, 118 U.Pa.L.Rev. 1023 (1970); Note, *The Administration of Complaints by Civilians Against the Police*, 77 Harv.L.Rev. 499 (1964); Comment, *POLICE—Philadelphia's Police Advisory Board—A New Concept in Community Relations*, 7 Vill.L.Rev. 656 (1962). *See also Council of Org. on Phila. Police Accountability & Responsibility v. Rizzo*, 357 F.Supp. 1289 (E.D.Pa.1973) (court ordering improved police procedures for reducing police misconduct and handling citizen complaints after finding frequent rights violations by members of department), *rev'd sub nom. Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Calvin v. Conlisk*, 367 F.Supp. 476 (N.D.Ill.1973) (refusing to order Chicago Police Department "to adopt and implement an effective police discipline system").

**23.** Cases based on such complaints are collected in Annot., Police Action in Connection with Arrest as Violation of Civil Rights Act, 42 U.S.C. § 1983, 1 A.L.R.Fed. 519 (1969 & Supp. 1979). *See also* Comment, *The Use of Deadly Force to Arrest: Conflicting and Uncertain Standards in the Courts*, 12 Creighton L.Rev. 655 (1978).

Moreover, "[i]n recent years the number of civil suits filed in federal court under 42 U.S.C. § 1983, alleging police misconduct has increased dramatically." Project, *Suing the Police in Federal Court*, 88 Yale L.J. 781 (1979) (footnotes omitted).

**24.** *Compare Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952) *and Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). In these cases the Supreme Court addressed the question of illegality in obtaining the physical presence of the accused for jurisdictional-due process purposes. See *United States v. Toscanino*, 500 F.2d 267 (2nd Cir. 1974), where the Second Circuit noted what has since been considered an exception to the Ker-Frisbie doctrine in cases where gross mistreatment, shocking to the conscience, had been perpetuated as part of the forcible abduction of the accused.

**25.** Implicit in our decision is the conclusion that considerations of judicial integrity do not dictate that an exclusionary rule should be invoked. See *State v. Sears*, 553 P.2d 907, 911–12 (Alaska 1976), for a discussion of this second rationale for the exclusionary rule.

REVERSED AND REMANDED for further proceedings consistent with this opinion.

BURKE, Justice, concurring.

Were it not for the legislature's recent enactment of AS 11.81.370, I would have grave reservations about our interpretation of AS 12.25.080. However, I am persuaded to join in the opinion of my colleagues because I believe that the legislature's enactment of AS 11.81.370 is strong evidence of what it intended when it previously enacted AS 12.25.080. *See* 2A C. Sands, Sutherland Statutory Construction § 49.11 (4th ed. 1973).