James G. NATHAN, Appellant,

v.

MUNICIPALITY OF ANCHORAGE, Appellee.

No. A–6635.

Court of Appeals of Alaska.

March 27, 1998.

Rehearing Denied April 21, 1998.

Richard D. Kibby, Anchorage, for Appellant.

Benjamin O. Walters, Jr., Assistant Municipal Prosecutor, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellee.

Before COATS, C.J., and
MANNHEIMER and STEWART, JJ.

MANNHEIMER, Judge.

James G. Nathan appeals his conviction for driving while intoxicated, Anchorage Municipal Ordinance 9.28.020. After Nathan was arrested for DWI, he submitted to a breath test (which showed his blood-alcohol level to be .134 percent), and he declined the offer of an independent blood test. However, Nathan contends that the breath test result should be suppressed because, when he gave up his right to an independent blood test, he did not really understand his right to such a test.

Nathan is deaf, and has been since birth. In the trial court, Nathan asserted that, because of his deafness, he was unable to communicate well with the officer who administered the breath test and who explained Nathan's right to an independent blood test. Nathan contended that, because of this difficulty in communication, he was unable to follow the officer's explanation of his right to an independent test. Even though Nathan signed the waiver-of-test

form, Nathan stated that he signed the form to please the officer, without understanding what he was relinquishing.

District Court Judge Stephanie Rhoades held a hearing into Nathan's allegations. At this hearing, Nathan testified that his primary language was American Sign Language; he asserted that he was unable to communicate effectively in English, whether oral or written. Nathan's description of his linguistic ability was corroborated by the testimony of his high school teacher, who declared that, at the time Nathan graduated from high school, his ability to read was perhaps at a third-grade level. Nathan's teacher testified that Nathan had a limited ability to read lips.

With regard to his understanding of the right to an independent blood test, Nathan testified that he did not understand this right. Nathan declared that, even though he read the consent/waiver form and eventually signed the waiver of his right to an independent test, he did not understand the word "independent" as it was used on the form, and he did not understand what he was giving up when he signed the waiver. However, Nathan conceded on cross-examination that he understood, and could have written, phrases such as "Let me use the phone" or "I do not understand".

Both the officer who arrested Nathan (Derek Hsieh) and the officer who administered the breath test to Nathan (Joe Caswell) testified that Nathan was obviously deaf, and that he remained mute throughout their contacts with him. Caswell, in particular, testified that he was fully aware that Nathan could neither speak nor hear. However, both Hsieh and Caswell also testified that Nathan seemed to understand what they said to him: he followed their directions and otherwise responded appropriately to their remarks and questions. When Caswell asked Nathan (in writing) if he could read and write English, Nathan nodded affirmatively without hesitation. Nathan in fact began to write out a statement concerning the events leading up to his arrest. The ensuing interview between Caswell and Nathan was conducted with pen and paper.

Officer Caswell's testimony was corroborated by the record of Nathan's first appearance and bail hearing in front of Magistrate Roy V. Williams. At that hearing, Magistrate Williams communicated with Nathan by passing written notes back and forth. Following this exchange of written communications, the magistrate was apparently satisfied that Nathan understood the proceedings—and, in particular, his obligation to appear in court at the time stated in his bail release form—because the magistrate released Nathan on his own recognizance after Nathan signed an acknowledgement of the conditions of his release.

After hearing this conflicting testimony, and after listening to the tape of Nathan's first appearance in front of Magistrate Williams, Judge Rhoades concluded that Nathan, despite his disability, had understood his right to an independent test and had knowingly waived that right. Judge Rhoades concluded, based on Nathan's apparent understanding of Officer Hsieh's communications at the scene, that Nathan "must have been reading Officer Hsieh's lips[;] . . . the defendant [described] what was being explained to him [by Officer Hsieh] in his own testimony." With regard to the more important issue of Nathan's communications with, and understanding of, Officer Caswell, Judge Rhoades concluded that Nathan had sufficiently understood the officer to acquire an understanding of his right to an independent test.

[Regarding Nathan's] contact with Officer Caswell, . . . the defendant began to write a statement. . . . [W]hile [this statement] was not grammatically focused, nonetheless it was a coherent, cohesive, cogent statement of what was going on with this accident[.] . . . Officer Caswell actually stopped [Nathan's work on this statement] and directed him toward the information that they had to deal with in terms of the processing for driving while intoxicated. It appears that Officer Caswell then wrote out notes to the defendant, and Officer Caswell testified that the defendant appeared to be nodding his head "yes" . . . as they were going along. [Nathan facially appeared] to understand what was going on. He was given copies of the

forms to read along. Officer Caswell ... did appear to be sensitive to the fact that the defendant was not capable of hearing or speaking, and did undertake to try to make sure that the defendant understood what was going on and understood the forms and understood his rights.

... [T]he most compelling [evidence] here [is] that the defendant, though ... he does clearly have a basic understanding of English, and does have a basic ability to write English, and was presented with a pen and paper, did not write down, at any time during the DWI processing, that he did not understand[, nor did he] request to have additional information or an interpreter or some other form of understanding the information. And I guess what's important to me about that is that, without dealing with a defendant who is unfamiliar with these resources, apparently the defendant did study the driver's license booklet, which all drivers have to study in order to take the written test, he did take a written test, apparently using, according to his own testimony, the assistance of an interpreter. And, so it's not like he doesn't have familiarity with the fact that in circumstances where he doesn't understand something, he needs to request an interpreter. He has done that before, when he wanted to take advantage of the privilege to drive.... The defendant knows how to get the use of resources when he wants to obtain a privilege, but in this case he didn't ask for [interpretative assistance]. And I find that significant. Because now it's a little too convenient [for Nathan] to come in after the fact and say that he didn't understand....

Judge Rhoades cited Nathan's later communications with Magistrate Williams as further corroboration of Nathan's level of understanding:

[Regarding Nathan's] contact with the magistrate, ... the magistrate's [duty] here was to make sure that the defendant understood his obligation to return to court. Apparently their communication was effective enough that the magistrate had no concerns about that, [because the magistrate] released him [on] his own re-

cognizance, and the defendant testified [that] he understood when he was to return.

From all of this evidence, Judge Rhoades concluded that Nathan had possessed a basic understanding of his right to an independent blood test, and that Nathan knowingly and intelligently waived his right to an independent test:

So, all in all, it would appear to me that the defendant's ability to read and write—while they may be still wholly at a fourth-grade level even now, twenty-three years after school—that he nonetheless, through life experience, his workplace, the fact that he is a licensed driver, the fact that he does manage to exist and live in a world where deaf people, frankly, are not accommodated many times, tells me that he most likely understood, at least to the extent that he needed to understand, that he had a right to an independent test and the other rights that were explained to him on the documents[.] ... [I] find that he was adequately advised and he knowingly, intelligently waived his right to an independent test.

■■■ On appeal, Nathan attacks Judge Rhoades's finding that he understood his right to an independent test. *See Ahtuangaruak v. State,* 820 P.2d 310, 311–12 (Alaska App.1991) (a DWI arrestee's purported waiver of the right to an independent test is invalid "if the arrestee, because of ... a language barrier, or [for] any other reason, fails to acquire a basic understanding of the right to an independent test"). On this issue of historical fact, we must affirm the trial judge's ruling unless it is shown to be clearly erroneous. *Cockerham v. State,* 933 P.2d 537, 539 n. 9 (Alaska 1997).

■■■ A finding of fact is "clearly erroneous" if, after review of the record, an appellate court is left "with a definite and firm conviction ... that a mistake has been made, even though there may be evidence to support the [trial court's] finding." *Cockerham, supra.* Having reviewed the evidence presented to the district court, we conclude that Judge Rhoades's finding is not clearly erroneous.

As Nathan points out in his brief, the evidence was obviously contradictory on the issue of whether Nathan understood what Officer Caswell told him about his right to an independent test. At the hearing, Nathan presented evidence that, if believed, would support a finding that he did not understand his right to an independent test. Moreover, Nathan pointed out that there were reasons to distrust the accuracy of the government witnesses' testimony. However, as Judge Rhoades explained in her decision (quoted above), there were also reasons to distrust the accuracy of Nathan's testimony.

In the end, it was Judge Rhoades's task to assess the credibility of the various witnesses' testimony and to resolve the central issue of fact: did Nathan acquire a basic understanding of his right to an independent test? *Anthony v. State,* 521 P.2d 486, 492 (Alaska 1974); *Long v. State,* 772 P.2d 1099, 1101 (Alaska App.1989). The judge resolved this issue against Nathan, and the record provides substantial support for her conclusion. While reasonable people might perhaps draw differing conclusions from the evidence presented at the hearing, we can not say that Judge Rhoades's conclusion is clearly erroneous.

Nathan argues in the alternative that, even if he knowingly waived his right to an independent test, his breath test result should nevertheless be suppressed because the police failed to take reasonable steps to accommodate his hearing and speech disability. Nathan asserts that the police violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* by failing to provide him with an American Sign Language interpreter or to utilize some alternative method to facilitate communication.

Nathan's claim is based on section 12132 of the Act, which declares that "no qualified individual with a disability shall, by reason of such disability, ... be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity". Elaborating on this statutory provision, one of the regulations promulgated under the Act, 28 C.F.R. § 35.160(b)(1), obligates public entities to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity". The Act's definition of "auxiliary aids and services" expressly includes "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments". *See* 42 U.S.C. § 12102.

Nathan argues that the Anchorage Police Department's processing of arrestees qualifies as a "service[ ], program[ ], or activit[y] of a public entity" for purposes of section 12132 of the Act. Based on this premise, Nathan contends that the police were obliged to furnish him with an interpreter during his DWI processing (and, in particular, during the explanation of his right to an independent blood test).

■ However, even assuming that a police department's processing of arrestees is a "program" or "service" governed by the Americans with Disabilities Act, the Act would require the police department to furnish auxiliary aids and services only *"where necessary* to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of" the arrest processing. (Emphasis added) Moreover, under the statutory definition of "auxiliary aids and services", an interpreter would apparently not be required if the police department offered some "other effective method[ ]" of communication. Judge Rhoades found that, despite Nathan's disability, effective communication did in fact take place between Nathan and the officers, and Nathan did understand his right to an independent test. The judge's resolution of these issues of fact constitutes an implicit finding that no violation of the Americans with Disabilities Act took place.

■ Further, even assuming that the police violated the Act, Nathan must still cross another legal hurdle: he must establish that a violation of the Americans with Disabilities Act will trigger the exclusionary rule and require suppression of his breath test result. This is not self-evident.

If Nathan, because of his hearing impairment, had failed to acquire a basic understanding of his right to an independent test, then he would be entitled to suppression of his breath test result. *Ahtuangaruak,* 820 P.2d at 311–12. But Judge Rhoades found that Nathan did understand his right to an independent test. Thus, Nathan's argument for suppression is a novel one. Nathan argues that even though he did understand his right to an independent test—that is, even though the police department's asserted violation of the Americans with Disabilities Act did not adversely affect his understanding of his rights or the voluntariness of his decision to waive the independent blood test—he still is entitled to suppression of the breath test result. Nathan argues that suppression of evidence is the only effective way to make the police obey the mandates of the Act.

In several decisions, the Alaska appellate courts have addressed the issue of whether suppression of evidence should result from the government's violation of a statute (as opposed to the government's violation of a provision of the Constitution). *See,* for example, *Zsupnik v. State,* 789 P.2d 357, 361 (Alaska 1990), *Ward v. State,* 758 P.2d 87, 90 (Alaska 1988), *Copelin v. State,* 659 P.2d 1206, 1214–15 (Alaska 1983), *State v. Sundberg,* 611 P.2d 44, 50–52 (Alaska 1980), and *Harker v. State,* 637 P.2d 716, 719–720 (Alaska App.1981), *aff'd on other grounds,* 663 P.2d 932 (Alaska 1983). Nathan does not discuss (or even cite) any of these cases.

█ It is true that, broadly speaking, the purpose of the exclusionary rule is to deter the police from engaging in future illegal conduct. Violations of the Americans with Disabilities Act clearly qualify as "illegal conduct". However, when the government has violated a statute (as opposed to the Constitution), suppression of evidence has generally been imposed only when the government's violation of the statute demonstrably prejudiced a defendant's ability to exercise related constitutional rights or to prepare or present a defense. For instance, in *Sundberg,* the police used excessive force to arrest a fleeing suspect, but the supreme court refused to suppress the resulting evidence. The court concluded that other effective means existed to deter future similar illegality; the court cited "the possibility of ... police department [disciplinary] proceedings; civil rights actions; and common law tort suits against the offending officer". *Sundberg,* 611 P.2d at 51–52.

Similar measures are apparently available to deter and redress violations of the Americans with Disabilities Act. Given the existence of these measures, and the absence of any indication that the police have engaged in persistent, purposeful violations of the Act, we hold that exclusion of evidence would not be the remedy even if Nathan could show that the police violated the Act in his case.

The district court properly denied Nathan's motion to suppress his breath test result. Accordingly, the judgement of the district court is AFFIRMED.